## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| **M.A.P.S., on her own behalf and on behalf of others similarly situated,** | |
| **Petitioner,** | **EP:25-CV-171-DB** |
| **v.** | |
| **DONALD J. TRUMP, in his official capacity as President of the United States, et al.,** | |
| **Respondents.** | |

## RESPONDENTS' OPPOSITION TO PETITIONER'S
## MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION AND RESPONSE TO
## ORDER TO SHOW CAUSE

In accordance with the Court's May 16, 2025, Order Setting Expedited Briefing Schedule on Preliminary Injunction (EFC No. 29) and Order to Show Cause (ECF No. 28), Respondents request that Petitioner's Motion for Classwide Preliminary Injunction (ECF No. 34) and request that this Court "[g]rant a writ of habeas corpus," ECF No. 1 at 27, be denied for the reasons provided below.

### Introduction

Petitioner's motion for a preliminary injunction should be denied. First, Petitioner has not shown that she is likely to succeed on the merits. She has not established standing for injunctive relief. And she has not established that this Court has jurisdiction to review whether the preconditions to the AEA are satisfied or the jurisdiction to review the President's findings that Tren de Aragua ("TdA") members are involved in, threatening, or attempting an "invasion" or "predatory incursion," that TdA has "infiltrated," and "acts at the direction" of the Venezuelan

1

government. And in any case, the President's findings satisfy the statutory preconditions. Moreover, the Immigration and Nationality Act ("INA") strips this Court of jurisdiction to enjoin transfers of aliens detained under Title 8 out of this district.

Petitioner also fails to show her remaining claims will succeed on the merits. She is receiving all the process to which she is due. Further, the INA has not implicitly repealed the AEA, and Petitioner is not entitled to seek asylum, statutory withholding of removal, or voluntary departure. This Court also cannot review a determination that removal will not violate the U.S. Government's obligations under the regulations implementing Article III of the Convention Against Torture ("CAT").

Finally, Petitioner fails to satisfy the remaining requirements for preliminary injunctive relief. She cannot show irreparable harm because burdens attendant to removal are insufficient standing alone. Further, Petitioner has not shown that the balance of the equities and public interest lie with her. Individuals identified as members of a Foreign Terrorist Organization cannot credibly claim injury from the President's decision to expel them from the United States. Meanwhile, the President—and public—have an overwhelming interest in the security of the United States and in ensuring that the Executive's significant outlay of diplomatic capital for this mission is not wasted.

## Background

### I.    Tren de Aragua's designation as a Foreign Terrorist Organization and under the Alien Enemies Act

Tren de Aragua is a transnational criminal organization that originated in Venezuela and has "conducted kidnappings, extorted businesses, bribed public officials, and authorized its members to attack and kill U.S. law enforcement." Office of the Spokesperson, Dep't of State,

Designation of International Cartels (Feb. 20, 2025); *see also* Smith Decl., ECF No. 39-1, Ex. A, ¶¶ 6–7; Charles Decl., ECF No. 39-2, Ex. B. The President has found that TdA operates "both within and outside the United States" and its "extraordinarily violent" campaign of terror presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 14,157, 90 Fed. Reg. 8439, 8439 (Jan. 29, 2025). On the first day of his term, the President declared a national emergency to respond to that threat. *Id*. The threat is so severe that, on February 20, 2025, the Secretary of State designated TdA a Foreign Terrorist Organization. 90 Fed. Reg. 10,030 (Feb. 20, 2025). The immigration laws authorize such a designation when a foreign organization engages in "terrorist activity" or "retains the capability and intent" to do so, thereby threatening "the national security of the United States." 8 U.S.C. § 1189(a)(1), (d)(4); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 9 (2010). On March 14, 2025, the President signed a proclamation, invoking his authority under the Alien Enemies Act, 50 U.S.C. §§ 21-24, against TdA members. *See* Proclamation No. 10,903, 90 Fed. Reg. 13,033, 13,034 (Mar. 20, 2025) (the "Proclamation").

The Proclamation outlines the President's findings that TdA members meet the statutory criteria for removal under the AEA. The President found that TdA, which "commits brutal crimes" including murder and kidnapping, is "conducting irregular warfare and undertaking hostile actions against the United States." *See* 90 Fed. Reg. at 13,033. The President further found that TdA has "engaged in and continues to engage in mass illegal migration" to further TdA's objectives: "harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." *Id*. And the President found that TdA works with the Maduro-sponsored Cártel de los Soles to use "illegal narcotics as a weapon to 'flood' the United States." *Id*.

3

The President additionally found that TdA and other criminal organizations have taken control over Venezuelan territory. *Id*. Moreover, TdA is "closely aligned with" Maduro's regime in Venezuela, and indeed has "infiltrated" the regime's "military and law enforcement apparatus." *Id*. The resulting "hybrid criminal state," "is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States," posing "a substantial danger." *Id*. at 13,033–34. Based on those findings, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies" under 50 U.S.C. § 21. *Id*. at 13,034. Further, the President found "all such members of TdA . . . chargeable with actual hostility against the United States" and "a danger to the public peace or safety." *Id*.

All such TdA members "are subject to immediate apprehension, detention, and removal." *Id*. To that end, the President directed the Attorney General and the Secretary of Homeland Security to, "apprehend, restrain, secure, and remove every Alien Enemy described" above. *Id*.

## II.    The *J.G.G.* case

On March 15, 2025, five aliens, nationals of Venezuela asserting fear of removal under the Proclamation, filed a putative class-action complaint along with a motion for a temporary restraining order ("TRO") in the District of Columbia, pursuing claims based on the Administrative Procedure Act. *J.G.G. v. Trump*, No. 25-cv-00766 (D.D.C.). After relief was granted, and on motion for a stay pending appeal, the Supreme Court rejected this effort, holding that, because the aliens' claims "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas," "jurisdiction lies in only one district: the district of confinement." *Trump v. J.G.G.*, 604 U.S. ——, 145 S. Ct. 1003, 1005-06 (2025) (per curiam) (quoting *Rumsfeld v.*

*Padilla*, 542 U.S. 426, 443 (2004)). The Court further held that the aliens are "entitled to notice

and opportunity to be heard 'appropriate to the nature of the case,'" including notice "that they

are subject to removal under" the AEA, "within a reasonable time and in such a manner as will

allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* at

1006 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). In a

subsequent decision, the Supreme Court explained further that "to 'actually seek habeas relief,' a

detainee must have sufficient time and information to reasonably be able to contact counsel, file

a petition, and pursue appropriate relief." *A.A.R.P. v. Trump*, 605 U.S. ----, No. 24A1007, 2025

WL 1417281 at *2 (May 16, 2025).

### III.    This suit

Petitioner M.A.P.S. alleges that she is detained at El Paso Processing Center in El Paso,

Texas, pursuant to the AEA and is at risk of imminent removal. ECF No. 1 ¶ 8. She further alleges

that she fled Venezuela due to political persecution, entered the United States in April 2023, was

later granted Temporary Protected Status, and is seeking asylum, withholding of removal, and

protection under the CAT from Venezuela. *Id.* Petitioner was arrested on April 9, 2025, and was

provided notice that she had been designated as an alien enemy under the AEA sometime shortly

thereafter. ECF No. 1 ¶¶ 11, 22. On May 10, 2025, Petitioner filed her Class Petition for Writ of

Habeas Corpus and Complaint for Declaratory and Injunctive Relief ("Petition") (ECF No. 1),

Motion for Class Certification (ECF No. 2) and Memorandum of Law in Support of Petitioner-

Plaintiff's Motion for Class Certification (ECF No. 2-1), and Emergency Motion for Temporary

Restraining Order (ECF No. 3). In her pending Motion for Class Certification, Petitioner seeks to

certify the following class under Federal Rules of Civil Procedure 23(a) and 23(b)(2):

> All noncitizens in custody in the Western District of Texas who were, are, or
> will be subject to the March 2025 Presidential Proclamation entitled 'Invocation

of the Alien Enemies Act Regarding the Invasion of the United Sates by Tren
De Aragua' and/or its implementation.

ECF No. 2-1 at 2.

On May 21, 2025, Petitioner filed her Motion for Classwide Preliminary Injunction (ECF No. 34) and Memorandum of Law in support of that motion (ECF No. 34-1) ("PI Mem.").

### Legal Standard

Emergency injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The danger of a mistaken ruling on an incomplete record is heightened when, as here, the "requested immediate injunctive relief deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978); *Sampson v. Murray*, 415 U.S. 61, 83–84 (1974) (A court is "quite wrong in routinely applying . . . the traditional standards governing more orthodox 'stays'" in an area to which "the Government has traditionally been granted the widest latitude."); *see also White v. Carlucci*, 862 F.3d 1209, 1211–13 (5th Cir. 1989) (applying *Sampson* and its progeny).

Petitioners must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court must ensure that each factor is satisfied before an injunction may issue. *See United States v. Texas*, 97 F.4th 268, 274, 295–96 (5th Cir. 2024); *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373–78 (5th Cir. 2023) (emphasizing that the movant must establish that the balance of equities "weighs heavily" or in their favor).

## Argument

**I. This Court lacks jurisdiction over Petitioner's claims except the narrow review permitted regarding whether Petitioner is an alien enemy.**

### A. Petitioner has not demonstrated the imminent threat of injury necessary for standing.

Petitioner has not "b[orne] the burden of establishing standing" necessary for injunctive relief. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). Because she "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation,'" *id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), "[a]t the preliminary injunction stage, then, [Petitioners] must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Id.*; *see also Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) ("[P]laintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction.").

But Petitioner has not shown that she is under an "actual and imminent" threat of suffering a "concrete and particularized" injury-in-fact. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Indeed, it is not clear what injury Petitioner claims is actual and imminent. If it is a claim that she will not receive notice and a reasonable opportunity to respond to her designation as alien enemies under the Proclamation, then she has not shown that injury at all—this very proceeding refutes that claim. The named Petitioner has been on notice of her designation as alien enemy for over a month. *See* ECF No. 1 ¶ 11. She has had ample time to prepare and file her individual habeas petition challenging her designation as an alien enemy within the scope of the Proclamation. And she has filed a habeas petition and is having it adjudicated, as is evidenced by this very brief.  That is all the process that is due.  *See A.A.R.P.*, 2025 WL 1417281 at *2 (notice "to 'actually seek habeas relief,'").

And if Petitioner's claim is that the removal itself is the claimed injury-in-fact, she has two potential problems. First, as to any putative class member who has a Title 8 removal order, there is no traceability of any removal to the putative class member's designation under the AEA. *California v. Texas*, 593 U.S. 659, 692–93 (2021) ("[T]raceability requires 'a casual connection between the injury and *the conduct complained of* '" such that the injury is "'fairly . . . traceable to *the challenged action of the defendant*'" (quoting *Lujan*, 504 U.S. at 560)). That is because the removal order itself is an independent authority under which the Executive may remove that putative class member. *Compare J.G.G.*, 2025 WL 1024097, at *1–2 (recognizing that aliens may be "subject to detention and removal under [the AEA]"), *with* 8 U.S.C. §§ 1229a (removal proceedings under the INA), *and* 1231(a) (requiring removal of aliens ordered removed under the INA). Since any removal would be authorized regardless of the validity of the AEA designation with respect to that alien, there would be no standing for injunctive relief because of a lack of traceability.

And even as to the named Petitioner and putative class members without Title 8 removal orders, there is still no showing of a clear likelihood that the Executive will remove those aliens without the due process that the government has already said those aliens will receive. *See J.G.G*, 2025 WL 1024097, at *2 ("The Government expressly agrees that 'TdA members subject to removal under the Alien Enemies Act get judicial review" and, "in this context, AEA detainees must receive notice after the date of this order that they are subject to removal under the Act" that is" afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs").

And if the harm Petitioner claims is alleged harm while in El Salvador or another country to which she may be removed, *see* PI Mem. at 29-30, those allegations cannot suffice for

purposes of standing in this proceeding. Currently, such harms are speculative, as Petitioner has not been removed for over a month and the Government generally will not remove an alien under the AEA while their habeas petition is pending (the process that is due). In addition, "the injury has to be 'fairly . . . trace[able] to the challenged action of the *defendant*, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560–61 (emphasis added) (alterations in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Any harms that might befall Petitioner abroad are alleged to be the result of independent actions of third parties and cannot suffice to support standing for an injunction.

### B.  There is no jurisdiction to review the President's Proclamation.

This Court lacks jurisdiction to review the Proclamation or enjoin the President's exercise of authority under Article II and the Alien Enemies Act. The Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties"); *Trump v. United States*, 603 U.S. 593, 607 (2024) (recounting that the President "has important foreign relations responsibilities: [including] . . . recognizing foreign governments . . . overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism . . . and immigration"); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

Consistent with that general rule, courts have held for over a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny: "The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course,

*plenary and not reviewable.*" *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis

added); *see also id.* ("Once the person is an alien enemy, obviously the course to be pursued is

essentially an executive function, to be exercised in the discretion of the President."); *see also,*

*e.g., Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948) (reasoning, on appeal from "[d]enial of a

writ of habeas corpus," that "some statutes 'preclude judicial review'" and "the Alien Enemy Act

of 1798 is such a statute," as demonstrated by the clear text and "controlling contemporary

construction"); *id.* at 164–65 (noting that "every judge before whom the question has since come

has held that the statute barred judicial review"); *United States ex rel. Schlueter v. Watkins*, 67 F.

Supp. 556, 565 (S.D.N.Y. 1946) (reviewing habeas petition and explaining "courts are without

power to review the action of the executive in ordering removal of an alien enemy . . . except

with respect to . . . whether the relator is an enemy alien"), *aff'd*, 158 F.2d 853 (2d Cir. 1946);

*United States ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 900 (2d Cir. 1943) (similar).

Ultimately, "[t]he very nature of the President's power to order the removal of all enemy

aliens rejects the notion that courts may pass judgment upon the exercise of his discretion."

*Ludecke*, 335 U.S. at 164. For that reason, it has long been established that "[u]nreviewable

power in the President . . . is the essence of the" AEA. *Citizens Protective League v. Clark*, 155

F.2d 290, 296 (D.C. Cir. 1946).

This Court lacks power to review the President's Proclamation for another reason as well:

Whether the AEA's preconditions are satisfied is a political question committed to the

President's discretion, no different from the President's determination to trigger the

Constitution's Invasion Clause (Article IV, section 4). *See United States v. Abbott*, 1110 F.4th

700, 728 (5th Cir. 2024) (Ho, J., concurring) (observing that "[c]ourts across the country have

held that determining whether an invasion has occurred for purposes of Article IV is a

10

nonjusticiable political question"); *see also California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases). Any challenge to that determination is therefore foreclosed.

The Supreme Court has held that the political-question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). To guide courts, the Supreme Court identified six factors that indicate a question has been committed to the political branches. *See, e.g.*, *id.* at 217; *Kuwait Pearls Catering Co., WLL v. Kellog Brown & Root Servs., Inc.*, 853 F.3d 173, 178–79 (5th Cir. 2017). The President's determination under the AEA implicates at least two independently sufficient factors.

*First*, the determination that an "invasion" or "predatory incursion" is being perpetrated sits at the intersection of two areas the Constitution commits to the political branches: (1) foreign affairs, *see Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 327–28 (1994); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Indeed, "any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Similarly, the power to recognize foreign states and governments "resides in the President alone." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015).

*Second*, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards permitting courts to assess exactly when hostile entry and criminal and violent acts constitute an "invasion" or "predatory incursion" for AEA purposes. *See Martin v. Mott*, 25 U.S. 18, 31–32 (1827) (Story, J.). Thus, there is no basis for second-guessing the Executive's policy judgment

that such an "invasion" or "predatory incursion" is occurring. *See Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts . . . should review and perhaps nullify actions of the Executive taken on information properly held secret."). AEA proclamations are thus conclusive and preclusive. As for whether the Act's preconditions are satisfied, that is the President's call alone; the federal courts have no role to play.

### C. This Court lacks jurisdiction to enjoin the transfer of Petitioner or putative class members outside this district.

The government may detain aliens under the Immigration and Nationality Act both pending removal proceedings and after they have been ordered removed under a variety of statutes, including 8 U.S.C. §§ 1226(a), 1225(b), and 1231(a). And the government *must* detain aliens who are inadmissible or removable under certain provisions. *See, e.g.,* 8 U.S.C. §§ 1226(c)(1), 1231(a)(2)(A). This Court's temporary restraining order is therefore overbroad insofar as it restrains the government from acting according to those authorities for aliens detained under Title 8, which provides separate sources of authority from the AEA for detention and removal. *See J.G.G.*, 2025 WL 825116.

Indeed, the INA bars this Court from entering injunctive relief with respect to transfers in three different ways. *First*, under 8 U.S.C. § 1231(g)(1), the Executive has great discretion in deciding where to detain Petitioners. The INA precludes review of "any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General . . . ." 8 U.S.C. § 1252(a)(2)(B)(ii). Therefore, § 1252(a)(2)(B)(ii) bars relief that would impact where and when to detain Petitioners. *Dominguez-Estrella v. INS*, 71 F. Supp. 2d 578, 582 (W.D. La.) ("Under the current immigration

12

law, this court is specifically divested of jurisdiction to review discretionary decisions of the Attorney General."); *see also Van Dinh v. Reno*, 197 F.3d 427, 433–34 (10th Cir. 1999) (finding that judicial review of decision to transfer a detainee is inappropriate due to lack of jurisdiction). This Court's TRO thus improperly second-guessed the government's decision where to detain Petitioners—Congress has specifically barred such judicial intervention.

*Second*, § 1252(g) also bars enjoining transfers under Title 8. It prohibits district courts from hearing challenges to decisions and actions about whether, when, and where to commence removal proceedings. Reading the discretionary language in §§ 1231(g)(1) and 1252(g) together confirms that Congress foreclosed piecemeal litigation over *where* a detainee may be placed into removal proceedings. *See Glushchenko v. DHS*, 566 F. Supp. 3d 693, 701–04 (W.D. Tex. 2021) (distinguishing between unreviewable discretionary detention determinations and statutory and constitutional challenges to immigration detention); *see also Liu v. INS*, 293 F.3d 36, 41 (2d Cir. 2002) (habeas petition "must not be construed to be 'seeking review of any discretionary decision'" (quoting *Chmakov v. Blackman*, 266 F.3d 210, 215 (3d Cir. 2001))), *superseded by statute on other grounds as recognized by Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 113 (2d Cir. 2008); *Tercero v. Holder*, 510 F. App'x 761, 766 (10th Cir. 2013) (Attorney General's discretionary decision to detain aliens is not reviewable by way of habeas.).

*And finally*, this Court lacks jurisdiction "to enjoin or restrain the operation of" 8 U.S.C. §§ 1221–32 "other than with respect to the application of such provisions to an individual alien against whom proceedings under such [provisions] have been initiated." 8 U.S.C. § 1252(f)(1). Thus, this Court has no authority to prevent the transfer of any putative class member, not named in this action on an individual basis, to a place of its discretion under 8 U.S.C. § 1231(g). *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) ("§ 1252(f)(1) 'prohibits federal courts

from granting classwide injunctive relief' but 'does not extend to individual cases.'" (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999))).

### D. This Court lacks jurisdiction to consider CAT claims in habeas.

Petitioner's claims under the Convention Against Torture ("CAT"), as codified by the Foreign Affairs Reform and Restructuring Act ("FARRA"), *see* ECF No. 1, ¶¶ 103-105, are also barred. As several circuits have already held, under 8 U.S.C. § 1252(a)(4), federal courts lack jurisdiction in habeas to consider CAT claims. *See Kapoor v. DeMarco*, — F.4th ——, No. 22-2806, 2025 WL 908234, at *11 (2d Cir. Mar. 26, 2025); *Omar v. McHugh*, 646 F.3d 13, 18 (D.C. Cir. 2011); *Mironescu v. Costner*, 480 F.3d 664, 676–77 (4th Cir. 2007); *see also Benitez-Garay v. DHS*, No. SA-18-CA-422-XR, 2019 WL 542035, at *7 (W.D. Tex. 2019) ("[T]o the extent Petitioner contends that his removal would violate the CAT, section 1252(a)(4) expressly divests this Court of jurisdiction to review any cause or claim under the CAT.").

## II. Petitioner cannot succeed on the merits of her claims.

### A. The Proclamation comports with the requirements of the statute.

In all events, the Proclamation and its implementation are perfectly lawful. The AEA grants the President discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are met. First, there either must be "a declared war," "invasion," or a "predatory incursion" that is "perpetrated," "attempted," or "threatened against the territory of the United States." 50 U.S.C. § 21. Second, that hostile action must be by a "foreign nation" or "government." *Id.* The Proclamation satisfies both conditions. *See A.S.R. v. Trump*, No. 3:25-cv-00113-SLH, at 31-32, 33 (W.D. Pa May 13, 2025), ECF No. 72.

#### 1. TdA's actions constitute an invasion or predatory incursion.

As to the first prerequisite, the President determined that TdA is perpetrating an invasion *or* a predatory incursion into the United States. Although the word "invasion" includes a military entry and occupation of a country, the accepted definition of that term is far broader, as definitions contemporaneous with the passage of the AEA make clear. "Invasion" was defined to include a "hostile entrance," *see*, *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or a "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789). Nor is there any requirement that the purpose of the incursion be to possess or hold territory. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, TdA's actions fit accepted conceptions of an invasion. TdA's encroachment on U.S. territory is a hostile act contrary to the rights of citizens to be free from criminality and violence. *See* Smith Decl. ¶¶ 8–18.

Consideration of the term "invader" further informs a broader construction of the term "invasion" than the Court found. In Johnson's Dictionary, for example, "invader" is defined to mean "[o]ne who enters with hostility into the possessions of another" and "[e]ncroacher; intruder." The definition makes no requirement that the "invader" be armed or part of a military force or for what purposes he invaded. Nor are the examples of the term provided so homogeneous to so require—the term "invader" applied broadly to a variety of scenarios so long as both ingress and hostility were present. Use of the term in the Federalist papers as well as early acts of Congress further inform the broader understanding of the term. *See* Second Congress, Stat. I, ch. 28 § 1 (May 2, 1792); Fifth Congress, Stat. II, ch. 47 § 1 (May 28, 1798); *The Federalist* No. 41 (James Madison); Nos. 60, 73 (Alexander Hamilton).

At a minimum, the actions of TdA constitute a "predatory incursion" that justifies invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the

United States (2) for purposes contrary to the interests of the United States. *See, e.g., Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids during hostilities with Mexico falling well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully fishing in territorial waters); *Bas v. Tingy*, 4 U.S. (4 Dall.) 37 (1800) (broadly defining "enemy" and "war"). Here, there is no question that TdA members have effected entries into the United States and that those entries are contrary to both the interests and laws of this country: trafficking in substances and people, committing violent crimes, and conducting business with interests antithetical to those of the United States. *See* 90 Fed. Reg. at 13,034.

Petitioner's main contention is that "invasion" and "predatory incursion" both *necessarily* entail military actions by foreign governments or the opening salvo of war meant to displace a government or conquer territory. *See* PI Mem. at 19-20. There is no question that both terms include military actions, but both unquestionably have broader meanings not foreclosed by any source Petitioner cites. In fact, many of the sources relied on by Petitioner contain definitions supporting the government's argument. *See Webster's Dictionary*, "Invasion" (1828) ("[a] hostile entrance into the possessions of another); *id.*, "Incursion" ("entering into a territory with hostile intention"). In short, both definitions *include* military action, but neither is *limited to* such action.

Petitioner's reading of the AEA is unduly narrow, especially given Congress's intent to give the President "[u]nreviewable power . . . to restrain, and to provide for the removal of, alien enemies in time of war." *Citizens Protective League*, 155 F.2d at 294. Her arguments overlook that "new applications arise in light of changes in the world," and that the state of warfare has undergone significant change since 1793. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018). In analogous circumstances, the Supreme Court has recognized the impact of a changing

world on the import of terms. For example, in *Kyllo v. United States*, 533 U.S. 27, 33–34 (2001), the Court opined that ignoring the impact of "the advance of technology" on the degree of privacy afforded to citizens by the Fourth Amendment "would be foolish." Certainly, the common understanding of the term "search" in 1791 would not have included thermal-imaging to detect areas of high heat in private homes. Yet "the technology enabling human flight has exposed to public view (and hence, we have said, to official observation) uncovered portions of the house and its curtilage that once were private." *Id.* at 34. The legal principles, as understood at the time, remain the same. But the application must reckon with practical realities and changes to the world.

Like with the evolving application of "search," consideration of the realities of modern warfare is warranted in applying the AEA. Earlier generations of warfare involved large-scale conventional battles between armies and militias with linear formations and reliance on artillery on battlefields. W.S. Lind et al., *The Changing Face of War: Into the Fourth Generation*, Marine Corps Gazette (Oct. 1989); Christian Bahnareanu, *The Evolution of Warfare from Classic to Hybrid Actions*, 55 Strategic Impact 57–66 (2015). Modern warfare is characterized by massive technological advancements from the Founding, information warfare, and blurring lines between traditional state actors and nonstate actors; it requires rapid adaptation to quickly evolving scenarios and is no longer simply about territorial conquest. *See generally* Bahnareanu, 55 Strategic Impact at 57–66. Considering "invasion" or "predatory incursion" to apply only to such a rudimentary understanding of warfare—a type of warfare becoming extinct—not only fails to comport with contemporaneous understanding and usage, but also renders the AEA irrelevant in modern times, contrary to Congress's intent.

Consider the War on Terror. Much of the combat there involved special operations fighting cells and insurgencies to counteract and prevent terror plots. Such warfare would have been

unrecognizable at the time of the Founding. Yet there should be no doubt that al-Qaeda's conduct on 9/11 would constitute a predatory incursion and justify the application of the AEA to their members. Indeed, the District Court for the Western District of Pennsylvania recognized these changes in warfare by concluding that TdA satisfied the "government" requirement because it was directed by Venezuela. *A.S.R. v. Trump*, No. 3:25-cv-00113-SLH, at 32 (W.D. Pen. May 13, 2025), ECF No. 72, at 32. Such use of criminal gangs may not have been as familiar to the Founding generation. Nonetheless, Congress was aware that warfare evolved and changed overtime, which is why they granted the President broad leeway in determining when to issue a proclamation invoking the Alien Enemies Act.

With these modern realities in mind, the actions of TdA constitute an "invasion" or a "predatory incursion." TdA members have effected entries into the United States contrary to both the interests and laws of this country: they are flooding the United States with illegal narcotics; committing murders, kidnappings, and extortion; and trafficking in drugs, weapons, and humans, all in support of "the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033–34; *see also* Smith Suppl. Decl., Ex. A, ¶¶ 5, 8 (describing TdA's infiltration of American cities and violent acts against Americans); FBI Intelligence Assessment: Venezuelan Government Officials Use Tren de Aragua to Undermine Public Safety, 23 January 2025, Ex.C, p.2 (Venezuelan government employed TdA to "create political, social, and security issues for the USG."). This is the nature of warfare in modern times. *See* Kilcullen, 2 Scandinavian J. Mil. Studs. at 64 (showing that a broad range of war-waging activities are small, clandestine operations, not overt military/paramilitary actions). Preventing the President from removing alien enemies who may engage in such "irregular warfare," *id.* at 13,033, unduly prevents him from exercising his authority under "broad grants by the Congress" to carry

out his "solemn responsibility to make certain that the conduct of war is not only unimpeded but suffers from no threat of impediment," *Citizens Protective League*, 155 F.2d at 294.

The designation of TdA as a foreign terrorist organization—necessarily an organized and armed group—further supports a finding that TdA has begun an invasion. The organization operates "both within and outside the United States"—necessarily having secured entry into the United States. *See* Exec. Order No. 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 29, 2025); *Foreign Terrorist Organization Designations of Tren de Aragua etc.*, 90 Fed. Reg. 10,030 (Feb. 20, 2025); *see also* InSight Crime, *Tren de Aragua*, *supra* note 2 (describing TdA's hierarchical structure). And TdA's actions reflect that one of its purposes is "obtaining control over territory" in the United States. *See* Jonathan Limehouse, *Colorado Apartment to Close After Multiple Arrests, Claims of Venezuelan Gang Takeover*, USA Today (Jan. 14, 2025), https://www.usatoday.com/story/news/nation/2025/01/14/the-edge-at-lowry-apartments-aurora -colorado/77694475007; Nicole C. Brambila, *Venezuelan TdA Gang Uses Similar Aurora Tactics to Take Over Building in San Antonio, Texas*, Denver Gazette (Dec. 21, 2024), https:// denvergazette.com/news/immigration/venezuelan-gang-aurora-san-antonio-apartments-takeover /article_fc65e418-8d5e-11ef-bb8b-7fc830f6fa36.html. And TdA's activities in "setting down roots" in multiple South American countries further evidence its tactics of invading countries to gradually take control of territory therein. *Tren de Aragua: From Prison Gang to Transnational Criminal Enterprise*, InSight Crime (Oct. 2023), https://insightcrime.org/wp-content/uploads /2023/08/Tren-de-Aragua-From-Prison-Gang-to-Transnational-Criminal-Enterprise-InSight -Crime-Oct-2023-1.pdf; *see also* FBI Intelligence Assessment, Ex. C at p.2. This Court should

find that TdA's actions constitute an invasion or predatory incursion.  *See A.S.R. v. Trump*, No. 3:25-cv-00113-SLH, at 32 (W.D. Pen. May 13, 2025), ECF No. 72, at 31-33.

> **2. Given its intimate connection to Venezuela, TdA is a foreign nation or government for purposes of 50 U.S.C. § 21.**

The Proclamation makes clear that TdA qualifies as a "foreign nation or government" for at least two independent reasons. First, TdA's infiltration of key elements of the Venezuelan state, make it indistinguishable from Venezuela. *See* Proclamation. TdA's growth itself can be attributed to promotion via the actions of former Governor of Aragua Tareck El Aissami, who was later appointed Vice President in the Maduro regime. 90 Fed. Reg. at 13,033. And Maduro's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. *Id*. The Cártel de los Soles "coordinates with and relies on TdA . . . to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id*. Given how TdA is intertwined in the fabric of Venezuela's structures, it functions as a governing entity. And through those ties, TdA has become indistinguishable from the Venezuelan state.

Although Petitioners try to depict this invocation of the AEA as novel, the United States has a long history of using war powers against formally nonstate actors. Historically, the United States authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "opponents who had no formal connection to the state enemy," including during the Mexican–American and Spanish–American Wars. *Id.* at 2066–67. President Wilson famously sent U.S. troops into Mexico to pursue Pancho Villa, the leader of rebels opposed to the Mexican government. *Id.* at 2067. And more recently, President Clinton authorized missile strikes on al

Qaeda targets in Africa and elsewhere. *See generally El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010).

This history is important because statutes must be read "with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). The AEA is a war powers statute and thus must be read in light of a robust history of employing war powers against nonstate actors.

In all events, TdA also acts as a governing authority in the areas where it operates. As the Proclamation recognizes, "Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA." 90 Fed. Reg. at 13,033. In those areas where it operates, TdA acts as a criminal governing entity, independent or in place of the normal civil society and government. *See id.* Given TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela where it operates with impunity, it is well within the President's discretion to determine it constitutes a foreign "government" for purposes of invoking § 21.

Petitioner's contrary arguments lack merit. The government is not arguing that TdA is itself a "nation." But the control and authority TdA exercises in Venezuela is consistent with founding era definitions of "government." *See* Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ("the power or authority that one person exercises over another"). Additionally, although the AEA references the possibility that a covered entity *may* be able to enter a treaty with the United States, the statute does not in any way establish treaty-making authority as a prerequisite to inclusion. *See* 50 U.S.C. § 22 (contemplating circumstances "where no such treaty exists"). Nor is there any reason that specific terminology used in the Proclamation should weigh against the President's determination, PI Mem. at 21-22; members of

21

TdA are clearly "subject" to the authority of that criminal organization and the governance it wields. *See* Dyche & Pardon, *supra*.

Fundamentally, Petitioner disagrees with the President's determination that TdA and the state of Venezuela are sufficiently intertwined to justify invocation of the AEA. *See* PI Mem.at 21-22. Yet the President is entitled to examine the available evidence, including intelligence not available to others, and make a determination based on his *own* assessment. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting "the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information" unavailable to others); *cf. United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) ("[T]he President alone has the power to speak or listen as a representative of the nation."). It is not the role of this Court to second-guess those determinations based on a handful of declarations by individuals not involved with the assessment of evidence or decision-making culminating in the Proclamation. *See Chi. & S. Air Lines*, 333 U.S. at 111.

### B.   The AEA notice procedures comport with due process.

Put simply, the Plaintiff has received due process.  She was given notice that she is subject to the AEA, she has filed a habeas petition and is receiving due process *right now*.  Since she has not been removed without proper notice, her rights have not been violated.  And since she is awaiting adjudication of her habeas petition, removal is hardly imminent.

In any event, the AEA is a wartime authority designed to allow quick expulsion of enemies from U.S. territory and does not impose any specific notice or timing requirements. The habeas statute likewise requires no specific notice or timing requirements. And because aliens are entitled only to the process set forth by Congress, Petitioner's process claim cannot succeed given these statutory authorities. Even if Petitioner is entitled to some due process, what is owed

is "flexible and calls for such procedural protections as the particular situation demands."

*Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  Moreover, the government is not required to

provide procedures that a reviewing court or Petitioners find "preferable"; instead, a court "must

evaluate the particular circumstances and determine what procedures would satisfy the minimum

requirements of due process." *Landon v. Plasencia*, 459 U.S. 21, 35 (1982).  The Supreme Court

has nevertheless clarified that the particular circumstances surrounding AEA removals demand

that aliens have "sufficient time and information to reasonably be able to contact counsel, file a

petition, and pursue appropriate relief."  *A.A.R.P.*, 2025 WL 1417281 at *2.  The Government is

working on a new notice process in light of this clarification.

 Petitioner's request for a thirty-day notice period to satisfy due process is both excessive

and unnecessary.  The Supreme Court has already made clear that immediate removals prior to

notice and the opportunity for judicial review are illegal.  Any assertion that the government has

failed to comply with that requirement is unsubstantiated.  In fact, Petitioner's own

circumstances illustrate the adequacy of procedures.  She herself was able to recognize the

circumstances she was in, gain access to and representation of counsel, and successfully access

the judicial system.  She is not alone.  In fact, several other habeas petitions have been filed by

aliens subject to the AEA, many filed within twenty-four hours of the alien's designation. *See*

*Sanchez Puentes v. Garite*, 25-cv-0127 (W.D. Tex.); *Gutierrez Mejias v. Trump*, 25-v-061 (N.D.

Tex.); *Matos v. Noem*, 25-cv-57 (S.D. Tex.). And all putative class members have the benefit of

the notice inherent to several ongoing class-wide stay orders that have afforded those detainees

sufficient notice prior to any scheduled removal. *See, e.g., G.F.F. & J.G.O. v. Trump*, No. 25-cv-

2886 (S.D.N.Y.); *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex.); *A.S.R. v. Trump*, No. 25-cv-133

(W.D. Pa.).  Thus, Petitioner has received all the process she is due: notice that she is subject to

removal under the AEA, "afforded within a reasonable time and in such a manner as will allow [her] to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 2025 WL 1024097, at *2.

### C. Petitioner and the putative class are not entitled to a period of voluntary departure.

Petitioners' contention that a period of voluntary departure is *required* is not defensible. To be sure, the AEA permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom." 50 U.S.C. § 21. But it also broadly provides that alien enemies within the purview of a Proclamation "*shall be . . . removed as alien enemies.*" *Id.* (emphasis added). In this context, where the alien enemies are members of the hostile force itself, the President cannot be required to provide any period of voluntary departure prior to effectuating removal. The AEA's entire purpose would be undercut if active participants in hostilities must be asked to depart on their own terms.

For that reason, the Proclamation explains that TdA engaged in "mass illegal migration" with the objective of "harming United States citizens," and that this activity undermines public safety, while also enhancing the "Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033. That finding negates Petitioner's assertion that a period of voluntary departure is statutorily required—the AEA makes clear that voluntary departure is available only if an alien enemy is "not chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. Here, all members of TdA have been so charged under the Proclamation and through their designation as members of a Foreign Terrorist Organization. 90 Fed. Reg. at 13,034. This same argument has been rejected by the Western District of Pennsylvania. *See A.S.R. v. Trump*, No. 3:25-cv-00113-SLH, at 32 (W.D. Pen. May 13, 2025), ECF No. 72, at 37-38. This Court should do the same.

24

### D.  Title 8 is not the sole mechanism through which an alien may be removed.

Nor is Petitioner correct that the INA is the sole mechanism for removing an alien. The AEA does not require an "admissibility" or "deportability" determination of any alien, so there is no reason to believe that Title 8 and its "sole and exclusive" means for addressing *those* questions is implicated in this case. *See* 8 U.S.C. § 1229a(a)(3) (removal proceedings are "exclusive" only to the extent the government is determining admissibility or removability, as those terms are defined under Title 8). Rather, the INA and AEA are distinct mechanisms for effectuating the removal of certain aliens, just as Title 42 and the INA constitute different bases for *excluding* aliens. *See generally Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).

In fact, the immigration laws and AEA have been read harmoniously for over 75 years. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947). Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status. And for aliens subject to both Title 8 and Title 50, the Executive has discretion in deciding how and whether to proceed under either or both statutes. *See id.* (recognizing this discretion under pre-INA immigration law). Thus, the AEA and INA coexist with some overlap that gives the Executive discretion to determine how, whether, or when to apply them. *See, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court . . . must . . . strive to give effect to both." (cleaned up)).

Even if there *were* a conflict between the AEA and the INA, the AEA would control here. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Here, the AEA provides specific rules for removing a subset of aliens—those designated alien enemies—against the more general

25

provisions relating to removability provided by the INA. Thus, to the extent there may be any conflict, the AEA provides an exception to the more general applicability of the INA's removal provisions, and this is true regardless of the later enactment of the INA. *See*, *e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

### E. Petitioner is not entitled to seek relief or protection from removal under Title 8.

The Proclamation does not impermissibly prohibit aliens from seeking relief and protection from removal under federal law. As a threshold matter, as mentioned above, there is no jurisdiction to consider CAT claims in habeas. Moreover, there is no direct conflict between the United States' obligations under the CAT as codified by the FARRA and removals under the AEA. The United States continues to abide by its policy not to remove aliens to countries in which they are likely to be tortured. *See Munaf v. Geren*, 553 U.S. 674, 702 (2008). And "[s]eparation of powers principles . . . preclude the courts from second-guessing the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign." *Arar v. Ashcroft*, 585 F.3d 559, 578 (2d Cir. 2009) (en banc) (ellipsis in original) (quoting *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009)). "Under *Munaf* . . . the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba*, 561 F.3d at 514.

Nor is there a colorable argument that enemy aliens *must* be permitted to seek relief or protection prior to removal. Such relief is generally permitted only in the exercise of Executive discretion. *See Citizens Protective League*, 155 F.2d at 294 (noting common-law rule that "alien enemies have no rights, no privileges, unless by the king's special favor"). Petitioner's asserted

conflict between the INA and the AEA is illusory. The INA provides a system for determining removability and any relief or protection from removal for aliens under the authority of Title 8, whereas the AEA provides its own mechanisms to implement procedures and regulations governing removal and detention. *See* 50 U.S.C. § 21.

With respect to asylum and statutory withholding of removal related to persecution claims, none of the cited provisions constrain the *President's* actions under Title 50. *See* 8 U.S.C. § 1158(b)(1)(A) (Attorney General or Secretary of Homeland Security); 8 U.S.C. § 1231(b)(3) (Attorney General); 8 C.F.R. §§ 1208.16, 1208.18 (immigration judges, via delegation from the Attorney General); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993) (recognizing distinct grants of authority under the INA to the President and Attorney General among others). Nor are such constraints implicated just because the President has delegated certain authorities to the Attorney General. *See id.* at 172 n.28 (in implementing Proclamation, Attorney General is "carrying out an executive, rather than a legislative, command, and therefore would not necessarily [be] bound" by provisions of the INA).

In any event, individuals subject to removal under Title 50 are barred from asylum and withholding of removal. Asylum is a discretionary form of relief, and eligibility for such relief may be foreclosed on a categorical basis. *See Huisha-Huisha*, 27 F.4th at 730–31. Here, the AEA disallows relief for covered enemy aliens, representing the categorical conclusion that such aliens are not entitled to relief in the exercise of discretion. Likewise, aliens subject to removal under the AEA would not be eligible for statutory withholding of removal because the President's invocation of the AEA suggests that "there are reasonable grounds to believe that [such aliens are] a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv).

**III. The remaining equitable factors weigh strongly in the government's favor.**

**A.  Petitioner failed to show that she will suffer irreparable harm.**

First, Petitioner's allegations of irreparable harm through "summary removals" carry no weight. PI Mem. at 28-30. As explained above, the process provided to Petitioner and the putative class is adequate to provide them notice and opportunity to meaningfully challenge their designation as an alien enemy or raise any questions of interpretation or constitutionality, which is precisely the judicial review available to Petitioner under the AEA. *J.G.G.*, 2025 WL 1024097, at *2. The constitutional adequacy of Petitioner's process completely refutes any allegation that she is receiving no due process. As such, Petitioner has made no showing of irreparable harm.

Nor has Petitioner made a showing of likely irreparable harm from "harsh and life threatening" conditions if removed to El Salvador. PI Mem. at 29-30. The United States continues to abide by its policy not to remove aliens to countries where they are likely to be tortured. *See Munaf*, 553 U.S. at 702; *Arar*, 585 F.3d at 578. Nor has Petitioner demonstrated a likelihood of persecution in another country—her only evidence to that effect lies in her conclusory assertion of fear, with no supporting evidence, and the generalized speculation that Petitioner and putative class members "will face heightened scrutiny" in Venezuela and "possibly even violence from rivals of TdA." PI Mem. at 28.

Failing to make those showings, Petitioners' chief complaint is of a general "burden of removal." *See Nken*, 556 U.S. at 435. As the Supreme Court held, "it is accordingly plain that such a burden "cannot constitute the requisite irreparable injury." *Id.*

**B.  The balance of equites and public interest favor denial of preliminary injunctive relief.**

The balance of harms and the equities strongly favor the government here as an injunction irreparably harms the President's national security and foreign policy judgments. An injunction effectively usurps the President's statutory and constitutional authority to address a

28

terrorist gang that is engaging in an invasion. Such an injunction "deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The Executive Branch's protection of these interests, including "sensitive and weighty interests of national security and foreign affairs" inherent to combating terrorist groups, warrants the utmost deference. *Humanitarian Law Project*, 561 U.S. at 33–35; *see also Barr v. U.S. Dept. of Justice*, 819 F.2d 25, 26 (2d Cir. 1987) ("[B]ecause the injunction Barr sought would interfere with the executive branch's conduct of foreign affairs, the application must be considered under particularly stringent standards[.]").

Additionally, the Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). An injunction does just that, impeding the Executive's ability to swiftly remove aliens with no right to remain in the United States who are identified as alien enemies due to their gang activity. *See, e.g., Nken*, 556 U.S. at 436 (noting there "is always a public interest in prompt execution of removal orders" even where an alien asserts a risk of harm, and that interest "may be heightened" where "the alien is particularly dangerous").

Granting an injunction could also undermine the United States' ability to negotiate on critical foreign affairs and national security matters in the future, as foreign governments might reconsider their willingness to accept enemy aliens or attempt to use any resulting delays as bargaining leverage. In contrast to the harm to the government and the public, nothing prevents Petitioner or others from seeking individualized relief if they receive notice that they are subject to the AEA. Because they have not shown the balance of the equities and public interest lie in their favor, they have not made this essential showing for injunctive relief.

## IV. Petitioner must provide security.

Under the federal rules, this Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). If this Court grants preliminary relief to Petitioner, it should order Petitioner to post security for taxpayer funds expended during the pendency of this Court's order if it is later determined that Respondents were wrongfully enjoined. Moreover, despite the fact that ordinarily indigent plaintiffs are not to post bond under Rule 65(c), Petitioner has not adduced evidence of indigence. *See Carranza v. Reams*, 614 F.Supp. 899, 923 (D. Col. 2020); *Brown v. Callahan*, 979 F. Supp. 1357, 1363 (D. Kan. 1997) (because plaintiff has demonstrated that the limited preliminary injunction poses no likelihood of harm to the defendant and has been granted in forma pauperis status, the court presumes he cannot provide security for potential damages, and thus no bond is required).

## CONCLUSION

For the foregoing reasons, this Court should deny Petitioner's Motion for Class Certification.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ANTHONY NICASTRO
Acting Director

SARAH WILSON
Assistant Director

<u>/s/ Daniel M. Cappelletti</u>
DANIEL M. CAPPELLETTI
Trial Attorney

May 23, 2025                    *Attorneys for Respondents*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2025, I filed the foregoing document with the Clerk of the Court through the Court's ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully Submitted,

<u>/s/ Daniel M. Cappelletti</u>
DANIEL M. CAPPELLETTI
Trial Attorney