**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **M.A.P.S.,** *on her own behalf and on behalf of others similarly situated,* | § § | |
| **Petitioner,** | § § | |
| | § | |
| **v.** | § § | |
| | § | |
| **ANGEL GARITE, MARY DE-ANDA-YBARRA, DONALD J. TRUMP, PAMELA BONDI, KRISTI NOEM, U.S. DEPT. OF HOMELAND SECURITY, TODD LYONS, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPT. OF STATE, PETE HEGSETH, U.S. DEPT. OF DEFENSE, MIGUEL VERGARA, BRET BRADFORD, BOBBY THOMPSON, CHARLOTTE COLLINS, ROSE THOMPSON, and MURRAY AGNEW,** | § § § § § § § § § § § § § § § § | **EP-25-CV-00171-DB** |
| **Respondents.** | | |

**MEMORANDUM OPINION AND ORDER GRANTING PETITION AND ISSUING
WRIT OF HABEAS CORPUS**

On this day, the Court considered Petitioner M.A.P.S.' ("Petitioner") "Class Petition for

Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief" ("Petition"), filed on

May 10, 2025, ECF No.[1] 1, and her "Motion for Preliminary Injunction" ("Motion"), ECF No. 34,

filed on May 20, 2025.  Therein, Petitioner challenges her detention and removal, as well as the

detention and removal of others similarly situated, under President Donald J. Trump's ("President

Trump") "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by

---

[1] "ECF No." refers to the Electronic Case Filing ("ECF") number for documents docketed in this matter.  When a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the page numbers assigned by the ECF system.

Tren de Aragua" ("Proclamation 10903"), Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 14, 2025).  In her Petition, Petitioner asks this Court to:

> a. Assume jurisdiction over this matter; b. Certify this action on behalf of the proposed Petitioner Class, appoint the Petitioner as class representative, and appoint undersigned counsel from the American Civil Liberties Union and the American Civil Liberties Union of Texas as class counsel; c. Grant a temporary restraining order to preserve the status quo pending further proceedings; d. Enjoin Respondents from transferring Petitioner and the class out of this district during the pendency of this litigation without advance notice to counsel; e. Enjoin Respondents from removing Petitioner and the class pursuant to the Proclamation; f. Grant a writ of habeas corpus to Petitioner and the class that enjoins Respondents removing them pursuant to the Proclamation; g. Declare unlawful the Proclamation; h. Enjoin Respondents from applying the Proclamation to Petitioner and the class without providing 30-day notice of and an opportunity to respond to any designation as an alien enemy under the Proclamation prior to the removal date; i. Award Petitioner's counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and j. Grant such further relief as the Court deems just, equitable, and appropriate.

Pet. 26–27, ECF No. 1.

Respondents Angel Garite, Mary De-Anda-Ybarra, Donald J. Trump, Pamela Bondi, Kristi Noem, U.S. Dept. of Homeland Security, Todd Lyons, U.S. Immigration and Customs Enforcement, Marco Rubio, U.S. Dept. of State, Pete Hegseth, U.S. Dept. of Defense, Miguel Vergara, Bret Bradford, Bobby Thompson, Charlotte Collins, Rose Thompson, and Murray Agnew (collectively "Respondents") filed an "Opposition to Petitioner's Motion for Class[-]wide Preliminary Injunction and Response to Order to Show Cause," ECF No. 39, on May 23, 2025.

After due consideration of all the relevant pleadings, this Court finds the following: (1) this Court has jurisdiction over the instant matter; (2) as ordered[2] by this Court on May 22, 2025, class certification is appropriate, Petitioner is appointed as class representative, and undersigned counsel from the American Civil Liberties Union and the American Civil Liberties Union of Texas are appointed as class counsel; (3) Respondents are enjoined from transferring Petitioner and the class from the Western District of Texas pursuant to Proclamation 10903 without advance notice to counsel; (4) Proclamation 10903 is unlawful; (5) a writ of habeas corpus is hereby granted to Petitioner and the class that enjoins Respondents removing them from the United States pursuant to Proclamation 10903; (6) even if Proclamation 10903 were lawful, Respondents must still provide Petitioner and members of the class at least a 30-day notice of their Tren de Aragua ("TdA") designation, and an opportunity to respond to any designation prior to a removal date; and (7) nothing in this Court's order shall prohibit the Executive Branch from carrying out detention and removal pursuant to the Immigration and Nationality Act[3] ("INA") or any other statutory basis. Accordingly, Petitioner's "Class Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief," ECF No. 1, and her "Motion for Preliminary Injunction," ECF No. 34, are hereby **GRANTED**.

---

[2] This Court's "Memorandum Opinion and Order on Class Certification," ECF No. 38, was issued on May 22, 2025.

[3] The Court notes the Immigration and Nationality Act was codified into Title 8 U.S.C. Section 1101, *et seq.* The Court will therefore use these terms interchangeably.

**BACKGROUND**

This case arises out of the President's unprecedented peacetime invocation of a wartime law known as the Alien Enemies Act[4] ("AEA").  *See* Act of July 6, 1798, ch. 66, 1 Stat. 577.  These novel issues stand at the intersection of a stand-alone removal power, the AEA, and the later-enacted comprehensive immigration system, the Immigration and Nationality Act ("INA").  It is therefore critical for this Court to recount the history of the AEA, Proclamation 10903, and Petitioner's individual case.

A.  Brief History of the AEA

Title 50 of the United States Code contains provisions regarding war and national defense.  *See* 50 U.S.C. § 1 *et seq.*  Chapter 3 specifically covers "Alien Enemies".  *Id.* at § 21.  "Enacted in 1798 by a Congress consumed with fear of war with France, the Alien Enemies Act provided a wartime counterpart to the widely denounced Alien Friends Act, which granted the President sweeping power to detain and expel any noncitizen he deemed 'dangerous to the peace and safety of the United States.'"  *See J.G.G. v. Trump*, 145 S. Ct. 1003, 1007–08 (2025) (Sotomayor, J. dissenting) (citing the Act of June 25, 1798, 1 Stat. 571).  "Unlike the Alien Friends Act, which lapsed in disrepute . . . the Founders saw the Alien Enemies Act as a constitutional exercise of Congress's powers to 'declare War,' to 'raise and support Armies,' and to 'provide for calling forth the Militia to . . . suppress Insurrections and repel Invasions.'"  *Id.* (citing U. S. CONST., art. I, § 8,

---

[4] For clarity, when this Court refers to the AEA, it is referring to the Alien Enemies Act, 50 U.S.C. § 21, as enacted in 1798.  Conversely, when the Court refers to Proclamation 10903, it is referring to the executive order issued by President Trump on March 14, 2025, which invoked the AEA.

cls. 11–15.1 and Letter from J. Madison to T. Jefferson (May 20, 1798), in 30 Papers of Thomas Jefferson 358 (B. Oberg ed. 2003)).

The AEA is a wartime authority that grants the President of the United States specific powers with respect to the regulation, detention, and removal of alien enemies. As codified today, the AEA provides:

> [w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the president makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

50 U.S.C. § 21.

Title 50 Section 22 also provides a section for an alien enemy's voluntary departure when there are bilateral international agreements or treaties. Titled "Time allowed to settle affairs and depart," Section 22 reads:

> When an alien who becomes liable as an enemy, in the manner prescribed in section 21 of this title, is not chargeable with actual hostility, or other crime against the public safety, he shall be allowed, for the recovery, disposal, and removal of his goods and effects, and for his departure, the full time which is or shall be

> stipulated by any treaty then in force between the United States and
> the hostile nation or government of which he is a native citizen,
> denizen, or subject; and where no such treaty exists, or is in force,
> the President may ascertain and declare such reasonable time as may
> be consistent with the public safety, and according to the dictates of
> humanity and national hospitality.

50 U.S.C. § 22.

Prior to the invocation of Proclamation 10903, U. S. Presidents have invoked the AEA only three times, each in the context of an ongoing war: the War of 1812, World War I, and World War II.  During the War of 1812, President James Madison issued a proclamation that required subjects of Great Britain and Ireland "to report themselves to the marshal of the state in which such aliens resided.[5]"  In 1917, over a century later, the United States declared war against Germany in World War I.  Then-President Woodrow Wilson invoked the AEA at that time to curtail the ability of German aliens to own weapons and travel freely and provided for their possible confinement[6]. *See* 40 Stat. 1651, 1716, 1730, 1772.  Lastly, just one day after the Pearl Harbor attack in 1941, then-President Franklin Delano Roosevelt made a "public proclamation . . . that an invasion has been perpetrated upon the territory of the United States by the Empire of Japan[7]." 6 Fed. Reg. 6321.  The next day, President Roosevelt further proclaimed, "that an invasion or predatory incursion is threatened upon the territory of the United States by Germany[8]." *See also* 6 Fed. Reg. 6324

---

[5] *Lockington v. Smith*, 15 F.Cas. 758, 758–759 (No. 8,448) (CC Pa. 1817) (discussing the War of 1812 proclamation).

[6] Declaring the Existence of a State of War with the German Empire and Setting Forth Regulations Prescribing Conduct Toward Alien Enemies, Proclamation No. 1364, 40 Stat. 1650 (World War I).

[7] Alien Enemies—Japanese, Proclamation No. 2525, 55 Stat. 1700 (World War II).

[8] *Franklin D. Roosevelt, Proclamation 2526—Alien Enemies*, German Online by Gerhard Peters and John T. Woolley, THE AMERICAN PRESIDENCY PROJECT, https://www.presidency.ucsb.edu/no de/357751[https://perma.cc/6LAA-V8LT] (last accessed on June 9, 2025).

(reflecting a simultaneous proclamation[9] as to Italy); 7 Fed. Reg. 5535 (expanding the declaration to aliens from Hungary, Romania[10], and Bulgaria, after Congress declared war on those countries).

B. Proclamation 10903

Unlike the three prior invocations against sovereign nations during times of declared war, on March 14, 2025, President Trump invoked the AEA alleging the Tren de Aragua[11] criminal organization "is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." Proclamation No. 10903 § 1, 90 Fed. Reg. 13033 (Mar. 14, 2025). Therein, President Trump, in relevant part, set forth the following:

> Tren de Aragua (TdA) is a designated Foreign Terrorist Organization with thousands of members, many of whom have unlawfully infiltrated the United States and are conducting irregular warfare and undertaking hostile actions against the United States.
>
> TdA operates in conjunction with Cártel de los Soles, the Nicolas Maduro regime-sponsored, narco-terrorism enterprise based in Venezuela, and commits brutal crimes, including murders, kidnappings, extortions, and human, drug, and weapons trafficking. TdA has engaged in and continues to engage in mass illegal migration to the United States to further its objectives of harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States.
>
> TdA is closely aligned with, and indeed has infiltrated, the Maduro regime, including its military and law enforcement apparatus.

---

[9] https://archives.federalregister.gov/issue_slice/1941/12/10/6324-6326.pdf [https://perma.cc/3LD3-WFL4].

[10] Romania is spelled "Rumania" in the proclamation.

[11] TdA is an entity that the United States Department of State has designated as a foreign terrorist organization. *See* 90 Fed. Reg. 10030 (2025).

> Maduro leads the regime-sponsored enterprise Cártel de los Soles, which coordinates with and relies on TdA and other organizations to carry out its objective of using illegal narcotics as a weapon to "flood" the United States.
>
> Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA. The result is a hybrid criminal state that is perpetrating an invasion of and predatory incursion into the United States, and which poses a substantial danger to the United States. Indeed, in December 2024, INTERPOL Washington confirmed: "Tren de Aragua has emerged as a significant threat to the United States as it infiltrates migration flows from Venezuela." Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens.
>
> TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela.

*Id.*

Based on these assertions, President Trump proclaimed "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 14, 2025). President Trump further proclaimed, "all such members of TdA are, by virtue of their membership in that organization, chargeable with actual hostility against the United States and are therefore ineligible for the benefits of 50 [§] 22," and "all such members of TdA are a danger to the public peace or safety of the United States." *Id.* President Trump finally declared

that all noncitizens within this group "are subject to immediate apprehension, detention, and removal, and . . . shall not be permitted residence in the United States." *Id.*

On March 14, 2025, the Attorney General of the United States issued a "Memorandum for Law Enforcement Officers re: Guidance for Implementing the Alien Enemies Act (Mar. 14, 2025)," advising law enforcement about the procedures to effectuate removal of noncitizens subject to Proclamation 10903. *See* Ex. H[12], Sarabia Roman Decl. 17, Pet'r's Mem. of Law in Supp. of Mot., ECF No. 34-10 ("Limitations on Relief from Removal: An alien determined to be an Alien Enemy and ordered removed under the Proclamation and 50 U.S.C. § 21 is not entitled to a hearing before an immigration judge, to an appeal of the removal order to the Board of Immigration Appeals, or to judicial review of the removal order in any court of the United States.").

On April 7, 2025, the United States Supreme Court ("Supreme Court") reversed the Attorney General when it issued its first decision involving Proclamation 10903 and made clear judicial review is appropriate. *See J.G.G.*, 145 S. Ct. at 1006.  The Supreme Court asserted that "although judicial review under the AEA is limited . . . an individual subject to detention and removal under that statute is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Id.* (citing *Ludecke v. Watkins*, 335 U. S. 160, 163−164, 172, n. 17 (1948) (noting that while not raised in the case, "[t]he additional question as to whether a person restrained is in fact an alien enemy fourteen years of age or older may also be reviewed by the courts.").  The

---

[12] Exhibit H, as cited here, does not include a cover page within ECF No. 34. However, the Court implies this is Exhibit H based on the description in the docket entry as well as Petitioner's reference to this exhibit as such.

Court further made clear that "detainees are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" *Id.* (internal citation omitted).

In a subsequent opinion on Proclamation 10903, the Supreme Court advised that "[i]n order to 'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *A.A.R.P. v. Trump,* 145 S. Ct. 1364, 1368 (2025). While the Court did not specify how much time or notice is due, the Court made clear "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *Id.*[13]

C. Petitioner and the Certified Class

Petitioner M.A.P.S. is a 33-year-old Venezuelan national who is detained pursuant to Proclamation 10903 at the El Paso Processing Center in El Paso, Texas. Pet. 8, ECF No. 1. Petitioner fled Venezuela after repeated harassment, assault, and intimidation on the basis of political persecution. *Id.* Petitioner entered the United States with a CBP One[14] appointment in

---

[13] Respondents previously advised other courts its notice process permits removal within twelve hours if a designee does not affirmatively state an intent to file a writ of habeas corpus and within twenty-four hours after that if they have not been able to file such a writ within that time. *See* Ex. A, Cisneros Decl. 2–3, Pet.'s Mem. of Law in Supp. of TRO ECF No. 3-2. In this case, Respondents advised this Court "[t]he Government is working on a new notice process in light of this clarification." Resp'ts' Opp'n to Mot. 23, ECF No. 39.

[14] "The free CBP One™ mobile application enables aliens without appropriate documents for admission who seek to travel to the United States through certain southwest border land ports of entry (POEs) the ability to submit information through a module within the application instead of coming directly to wait at a POE." U.S. Customs and Border Protection, *CBP One Fact Sheet-English*, https://www.cbp.gov/document/fact-sheets/cbp-one-fact-sheet-english [https://perma.cc/3VAH-EFB2] (Jan. 9, 2023).

April 2023 and was later granted Temporary Protected Status[15] ("TPS") that was still in place at the time of the filing of the instant petition. *Id.* at 8–9. She is currently seeking asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") from Venezuela. *See id.* at 8.

On April 9, 2025, Immigration and Customs Enforcement arrested and subsequently detained Petitioner in Ohio[16], despite her active TPS which shields her from detention. *Id.* at 8–9. Sometime thereafter, she was asked to sign documents referencing the AEA and TdA. *Id.* at 9. Petitioner was told by officers the TdA allegations were because of her tattoos[17], but she denied any affiliation or membership with TdA. *Id.* Petitioner refused to sign the documents and has been detained ever since. *Id.*

---

[15] "The Secretary of Homeland Security may designate a foreign country for TPS due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances, where the country is unable to handle the return of its nationals adequately." U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Temporary Protected Status*, https://www.uscis.gov/humanitarian/temporary-protected-status [https://perma.cc/XF6L-STLT] (last accessed May 30, 2025).

[16] There is no evidence in the record specifying what date Petitioner was transferred to the Western District of Texas.

[17] Petitioner's six tattoos include the following: "[o]n her right forearm, she has a 'catrina', a skeletal woman symbolizing the loss of her brother; a rose with her ex-husband's name; a pocket watch marking her date of birth, surrounded by carnations; a family tribute phrase; an angel with a protective phrase; and a half-moon with three roses chosen for its visual appeal." Emergency Appl. for a TRO 43, ECF No. 3.

On May 10, 2025, Petitioner filed the instant petition[18], an application for a temporary restraining order[19], a motion to proceed under pseudonym[20], and a motion for class certification[21]. Pursuant to this Court's expedited briefing schedule[22], Respondents submitted a response in opposition to class certification on May 16, 2025. *See* Resp'ts' Opp'n to Class Cert., ECF No. 32. On May 22, 2025, this Court granted Petitioner's motion for class certification, appointed Petitioner as the class representative, appointed undersigned Petitioner's counsel as class counsel, and certified the following class: "all noncitizens in custody in the Western District of Texas who were, are, or will be subject to the March 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua' and/or its implementation." Order Granting Class Certification 16, ECF No. 38.  Notably, "Petitioner and the class in this action do not here contest any aspect of their ongoing immigration proceedings." Pet. 7, ECF No. 1.

On May 16, 2025, this Court issued four orders: (1) an "Order to Show Cause," ECF No. 28, ordering Respondents to show cause as to why Petitioner's writ should not be granted; (2) an

---

[18] "Class Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief," ECF No. 1. Notably, "Petitioner does not seek such [injunctive] relief against the President." *Id.* at 22. *See also* Pet.'s Mem. of Law in Supp. of TRO 5 n.2, ECF No. 3-1 ("Petitioner does not seek to enjoin the President, but the President remains a proper respondent because, at a minimum, Petitioner may obtain declaratory relief against him.").

[19] "Emergency Application for a Temporary Restraining Order," ECF No. 3, which was granted on May 13, 2025.  *See* Order Granting Motion for Temporary Restraining Order, ECF No. 16.

[20] "Motion to Proceed under Pseudonym," ECF No. 4, which was granted on May 13, 2025.  *See* Order Granting Petitioner-Plaintiff's Motion for Leave to Proceed Under Pseudonym, ECF No. 20.

[21] "Motion for Class Certification," ECF No. 2, which was granted on May 22, 2025.  *See* Memorandum Opinion and Order on Class Certification, ECF No. 38.

[22] "Order Setting Expedited Briefing Schedule for Motion for Class Certification," ECF No. 17.

"Order Setting Expedited Briefing Schedule on Preliminary Injunction," ECF No. 29, ordering the parties to fully brief the issues for a preliminary injunction pursuant to Rule 65; (3) an "Order Setting Hearing on Motion for Preliminary Injunction and Order to Show Cause," ECF No. 30, setting a hearing on said motions for May 29, 2025; and (4) an "Order Extending Original Temporary Restraining Order," ECF No. 31, finding good cause to extend this Court's original temporary restraining order until June 10, 2025 at 2:47 p.m. MDT.  On May 22, 2025, this Court issued its "Order Consolidating Hearing on Preliminary Injunction with Trial on the Merits" ("Order Consolidating"), ECF No. 37, which consolidated[23] the hearing on the preliminary injunction with trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Respondents filed their "Opposition to Petitioner's Motion for Class[-]wide Preliminary Injunction and Response to Order to Show Cause" ("Response in Opposition"), ECF No. 39, on May 23, 2025.  Lastly, on May 27, 2025, Petitioner filed her "Reply," ECF No. 44. The Court held its consolidated hearing on May 29, 2025. *See* Tr. of Hr'g on Mot. for Prelim. Inj. and Order to Show Cause ("Tr."), ECF No. 56.

## **LEGAL STANDARD**

Petitioner and the certified class seek equitable relief against their removal under Proclamation 10903. Pet. 22–27, ECF No. 1.  Individual habeas corpus proceedings are the proper vehicle for this type of relief. *J.G.G.*, 145 S. Ct. at 1005–1006 (citing *Ludecke*, 335 U.S. at 163–

---

[23] The parties filed notices related to objections to consolidation. *See* Pet.'s Notice of Non-Objection, ECF No. 46 ("Petitioner does not object to this consolidation."); *see also* Resp'ts' Notice of Obj., ECF No. 49 ("The administration has not implemented a new notice policy on remand from *A.A.R.P. v. Trump*, 605 U.S. ---, 2025 WL 1417281 (2025) and thus a final resolution of the case on the merits is premature.").

164 ("[c]hallenges to removal under the AEA . . . must be brought in habeas.")) "Regardless of whether the detainees formally request release from confinement, because their claims for relief 'necessarily imply the invalidity' of their confinement and removal under the AEA, their claims fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas." *Id.* (citing *Ludecke*, 335 U.S. at 163–164, *Nance v. Ward*, 597 U.S. 159, 167 (2022) and *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)).

"For 'core habeas petitions,' 'jurisdiction lies in only one district: the district of confinement.'" *Id.* at 1005–1006 (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)).  Habeas proceedings in a proper venue are currently the sole forum for review available to noncitizens designated alien enemies under Proclamation 10903. *See generally J.G.G.*  "Although judicial review under the AEA is limited, [the Supreme Court] ha[s] held that an individual subject to detention and removal under that statute is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Id.* at 1006 (citing *Ludecke*, 335 U.S. at 163, 172, n. 17).

Moreover, this Court will review Petitioner's claims under a summary judgment standard. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In cases where "the only issues before the court are pure questions of law," summary judgment is appropriate. *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (cleaned up); *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995) ("Because statutory terms are at issue, their interpretation is a question of law and it is the court's duty to define the

appropriate standard."). On May 29, 2025, this Court consolidated the preliminary injunction hearing with a trial on the merits. *See* Order Consol., ECF No. 37. The Court hereby overrules Respondents' objection,[24] and because the parties have not raised any genuine issues of material fact[25], the Court makes a final determination as to each issue as a matter of law.

## ANALYSIS

In her Petition, Petitioner raises eight causes of action against Respondents alleging Proclamation 10903 is unlawful. First, Proclamation 10903 is an *ultra vires* violation of Title 50 of the United States Code Section 21, *et seq.*, the AEA, because Proclamation 10903 does not satisfy all statutory preconditions necessary for the AEA's invocation. Second, Proclamation 10903 violates Title 8 of the United States Code Section 1101, *et seq.*, because the AEA removal process creates an alternative removal mechanism outside of the INA's "sole and exclusive" procedure. Third, Proclamation 10903 violates Title 8 of the United States Code Section 1158, Asylum, because the AEA removal process bars individuals from applying for asylum before removal. Fourth, Proclamation 10903 violates Title 8 of United States Code Section 1231(b)(3), Withholding of Removal, because it lacks safeguards to ensure individuals are not returned to a country where it is more likely than not that they would face persecution. Fifth, Proclamation 10903 violates Title 8 of the United States Code Section 1231, "Convention Against Torture" ("CAT"), because the AEA process lacks safeguards to ensure individuals are not returned to a

---

[24] *See* Resp'ts' Notice of Obj., ECF No. 49 ("The administration has not implemented a new notice policy on remand from *A.A.R.P. v. Trump* . . . and thus a final resolution of the case on the merits is premature.").

[25] The parties dispute whether the assertions in Proclamation 10903 are true. However, as stated below, this Court need not address these disputes to resolve all claims as a matter of law.

country where it is more likely than not that they would face torture.  Sixth, Proclamation 10903

violates Title 50 of the United States Code Section 22, the AEA, because Proclamation 10903

categorically bars voluntary departure without individualized assessments.  Seventh, Proclamation

10903 violates the Fifth Amendment's Due Process Clause because individuals are denied

meaningful protections to challenge their removal.  And eighth, Proclamation 10903 violates

Habeas Corpus because Proclamation 10903 provides for summary removal.  This Court will

address each issue and related claims in turn.

   A.  Petitioner has standing.

As a threshold matter, this Court must determine whether Petitioner has standing to bring

these claims against Respondents.  Standing "ensure[s] that federal courts do not exceed their

authority as it has been traditionally understood," *Spokeo Inc. v. Robins,* 578 U.S. 330, 338 (2016),

and "is an essential and unchanging part of the case-or-controversy requirement of Article III,"

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citation omitted).  To establish

standing, "the party invoking federal jurisdiction bears the burden" of establishing three elements:

(1) injury-in-fact, (2) causation, and (3) redressability. *Id.*

An 'injury in fact' [is] an invasion of a legally protected interest which is (a) concrete and

particularized" and "(b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (internal

citations omitted).  "For an injury to be 'particularized' it must affect the [party] in a personal and

individual way." *Spokeo*, 578 U.S. at 339 (internal citations omitted).  The injury-in-fact must also

be concrete. *See id.*  "Injuries are concrete only if they bear a 'close relationship' to injuries that

courts have traditionally recognized as concrete." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,

45 F.4th 816, 822 (5th Cir. 2022).  Without explicit guidance from the Supreme Court, the Fifth

Circuit urges lower courts to "focus[] on types of harms protected at common law, not the precise

point at which those harms become actionable." *Id.* (citing to *Cranor v. 5 Star Nutrition, L.L.C.*,

998 F.3d 686, 693 (5th Cir. 2021)).  In addition to bearing a 'close relationship' to injuries courts

have historically categorized as concrete, "a 'concrete' injury must also be '*de facto*'" meaning

that "it must actually exist."  *Spokeo*, 578 U.S. at 340.

The party must also be able to show "a causal connection between the injury and the

conduct complained of" meaning that "the injury has to be 'fairly . . . trace[able] to the challenged

action of the defendant, and not . . . th[e] result [of] the independent action of some third party not

before the court." *Lujan*, 504 U.S. at 560.  While Article III requires a causal connection between

the injury suffered by a party seeking relief, "it doesn't require a showing of proximate cause or

that 'the defendant's actions are the very last step in the chain of causation.'" *Id*.  Lastly, the party

must demonstrate "redressability", meaning it is "'likely' as opposed to merely 'speculative,' that

the injury will be 'redressed by a favorable decision'" from the court. *Lujan*, 504 U.S at 561;

*Friends of the Earth, Inc. v. Laidlaw Envtl Servs. (TOC), Inc.*, 528 U.S. 167, 168 (2000).

1. Petitioner has suffered an injury-in-fact.

Petitioner alleges her injury-in-fact is the "substantial risk of imminent removal under the

proclamation" thereby circumventing the humanitarian protections available to her under the INA.

Pet'r's Mem. of Law in Supp. of Mot. 9, ECF No. 34-1; Reply to Mot. 2, ECF No. 44.  Respondents

argue Petitioner cannot establish the first element because "it is not clear what injury Petitioner

claims is actual and imminent." Resp'ts' Opp'n to Pet'r's Mot. 7, ECF No. 39.  First, "[i]f it is a

claim that she will not receive notice and a reasonable opportunity to respond to her designation"
as an alien enemy under Proclamation 10903, "she has not shown that injury at all" because she
has already received notice, the instant case is proof using the process she is due, and the fact she
remains in immigration custody pending a decision in her habeas petition, means her removal is
"hardly imminent." *Id.* at 23.  Second, Respondent argues if Petitioner's injury is the lawfulness
of her actual removal, traceability is lacking for class members who may have removal orders
under Title 8 because "the removal order itself is an independent authority under which the
Executive may remove that putative class member." *Id.* at 8.  "Since any removal would be
authorized regardless of the validity of the AEA designation . . . there would be no standing for
injunctive relief because of a lack of traceability." *Id.*

Third, Respondent argues that although Petitioner herself does not have a removal order
under Title 8, as well as for any class members without said order, "there is still no showing of a
clear likelihood that the Executive will remove those aliens without the due process that the
government has already said those aliens would receive." *Id.*  Fourth, if Petitioner claims the
alleged harm she will suffer would occur while in El Salvador or another country to which she is
removed, "those allegations cannot suffice for purposes of standing in this proceeding" because
they are "speculative," and "[a]ny harms that might befall Petitioner abroad are alleged to be the
result of independent actions of third parties" insufficient to establish standing. *Id.* at 8–9. The
Court finds Respondents' arguments unpersuasive.

Petitioner has established an injury-in-fact.  Most simply, Petitioner is requesting injunctive
relief, which alone is enough to establish the injury-in-fact element of standing. *See D.B.U. v.*

*Trump*, No. 25-CV-01163, 2025 WL 1304288, at *2 (D. Colo. May 6, 2025) (citing *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 889 (11th Cir. 2023) ("For purposes of the concrete injury analysis under Article III, we have recognized three kinds of harm [including] a 'material risk of future harm' when plaintiff is seeking injunctive relief.")).    Further, Petitioner's detention in immigration custody impacts her liberty and property rights and is independently sufficient to establish an injury-in-fact that is concrete and particularized. Pet. 9, ECF No. 1; *see United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is a carefully limited exception.").    Contrary to Respondents' assertion "Petitioner has not been removed for over a month and the Government generally will not remove an alien under the AEA while their habeas petition is pending," the fact Petitioner has yet to be removed is inconsequential. Resp'ts' Opp'n to Pet'r's Mot. 9, ECF No. 39.

Further, the Court recognizes the instant proceedings lend to the conclusion Petitioner had notice of her designation and has been afforded the opportunity to seek judicial review.    However, like a similar case in Colorado, Petitioner's "habeas challenge is not merely about the notice to which they are entitled as a due process matter . . . [t]hey also challenge 'threshold issues'" as to the lawfulness of Proclamation 10903. *See D.B.U*, 2025 WL 1304288, at *2.    It would indeed be ironic if because an individual receives notice of their designation and files a habeas petition, they would then be kicked out of court for a lack of standing, left unable to seek judicial review of other issues of their confinement.    While it is true that Petitioner is receiving some form of process to challenge Proclamation 10903, due process is the floor, not the ceiling.    For these reasons, Petitioner has established an injury-in-fact.

2.    <u>Petitioner has established causation.</u>

Petitioner also establishes causation between her injury and Respondents' actions. Respondents designated Petitioner an alien enemy pursuant to Proclamation 10903.  Petitioner is currently in immigration custody solely because of this designation, as she has no removal order under Title 8.  Reply to Mot. 2, ECF No. 44.  But for President Trump's issuance of Proclamation 10903, it is unlikely that either Petitioner, or other class members similarly lacking Title 8 removal orders, would be in immigration custody.   The harm is directly related to and caused by Respondents.

Further, Respondents argue that although Petitioner does not have a removal order under Title 8, "there is still no showing of a clear likelihood that the Executive will remove those aliens [in the class without a removal order] without the due process that the government has already said those aliens would receive." Resp'ts' Opp'n to Mot. 8, ECF No. 39.  Respondents' assertion stands on weak footing given the emergent intervention multiple courts, including the Supreme Court, have been forced to take by Respondents attempting hasty removals pursuant to Proclamation 10903. *See e.g. A.A.R.P.*, 145 S. Ct. at 1034 ("The Government is directed not to remove any member of the putative class of detainees from the United States until further order of this Court") (issued at 1:18 AM EST on Saturday, Apr. 19, 2025).  For these reasons, Petitioner has established causation.

3.    <u>Petitioner establishes redressability.</u>

Finally, Petitioner can show that it is likely her injury will be redressed by a favorable decision of this Court.  A favorable decision from this Court would prevent Petitioner and her class

members from being removed from the United States pursuant to Proclamation 10903 by declaring Proclamation 10903 unlawful. An order by this Court would also ensure certified class members who have yet to be designated alien enemies would have the ability to challenge their designation. For these reasons, Petitioner has demonstrated redressability. Petitioner has met her burden to establish standing by showing an injury-in-fact, causation of the injury attributable to Respondents, and redressability if this Court were to find in her favor. For the reasons previously articulated, Petitioner has standing.

B. Petitioner's claims are justiciable.

At the outset, Respondents allege this Court is without authority to hear Petitioner's claims, "except the narrow review permitted regarding whether Petitioner is an alien enemy." Resp'ts' Opp'n to Mot. 7, ECF No. 39. This is plainly wrong[26]. The Supreme Court has made clear "[a]lthough judicial review under the AEA is limited . . . an individual subject to detention and removal under that statute is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she "is in fact an alien enemy fourteen years of age or older." *J.G.G.*, 145 S. Ct. 1006 (citing *Ludecke*, 335 U.S. at 163, 172, n. 17). Petitioner's

---

[26] Every other district court considering the threshold challenges to Proclamation 10903 on the merits agree those claims are reviewable. *See, e.g., J.A.V. v. Trump*, No. 25-CV-072, 2025 WL 1257450, at *14–18 (S.D. Tex. May 1, 2025) (granting summary judgment on ground that there is no invasion or predatory incursion within the meaning of the AEA); *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8–10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (rejecting government's invasion and predatory incursion arguments); *D.B.U. v. Trump*, No. 25-CV-01163, 2025 WL 1304288, at *4 (D. Colo. May 6, 2025) (rejecting Respondents' statutory arguments); *G.F.F. v. Trump*, No. 25-CV-2886, 2025 WL 1301052, at *8 (S.D.N.Y. May 6, 2025) (holding that courts, by their nature, interpret statutes); *A.S.R. v. Trump*, No. 25-CV-00113, 2025 WL 1378784, at *11 (W.D. Pa. May 13, 2025) (finding that the court can interpret the meaning of words within the proclamation).

claims that the AEA's statutory predicates have not been met—because TdA is not a "nation or government," and is not engaged in an "invasion" or "predatory incursion"—are fully within this Court's jurisdiction to review. Further, Petitioner's claims that Proclamation 10903 violates the INA and the Fifth Amendment's Due Process Clause involve questions of statutory and constitutional import, which may also be reviewed by this Court.

The Court finds Respondents' interpretation of *Ludecke,* 335 U.S. at 166–70, and the lower court decisions Respondents cite in their Response in Opposition, unpersuasive. Respondents cite to *Ludecke* to support their position that "[t]he very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion." Resp'ts' Opp'n to Mot. 10, ECF No. 39. But the larger context of this proposition in *Ludecke* refutes Respondent's narrow view of the Supreme Court's precedent. In fact, *Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had ceased—*i.e.*, the "shooting war" had ended. 335 U.S. at 166–70. The Supreme Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that once Congress declares war, the war continues for purposes of the AEA until the political branches declare it over. *Id.* at 167–169 (("'The state of war' may be terminated by treaty or legislation or Presidential proclamation. Whatever the modes, its termination is a political act.").

Nor is the political question doctrine a bar to this Court's jurisdiction. In general, the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid." *Cohens v. Virginia,* 19 U.S. 264, 404 (1821). Precedent has identified a narrow exception

to that rule, known as the "political question" doctrine. *See, e.g., Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 230 (1986) ("[t]he political question doctrine excludes from judicial review those controversies which" should be "committed for resolution to the halls of Congress or the confines of the Executive Branch.").  A controversy "involves a political question . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon v. United States,* 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr,* 369 U.S. 186, 217 (1962)).  In such a case, a court "lacks the authority to decide the dispute before it."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).

Here, Respondents argue this case involves a political question because deciding Petitioner's claims would force the Judiciary to interfere with the President's exercise of discretion, which is "no different from the President's determination to trigger the Constitution's Invasion Clause (Article IV, section 4)." Resp'ts' Opp'n to Mot. 10, ECF No. 39.  This misunderstands the issue presented.  Petitioner does not ask this Court to determine the wisdom of the President's decision to invoke the AEA instead of removing people under Title 8.   She instead seeks to determine whether her removal pursuant to Proclamation 10903 comports with the AEA and other existing federal laws, thereby creating a separate and independent removal power for the first time in nearly 84 years.[27]

Respondents' argument has also been foreclosed by the Supreme Court's directives in *J.G.G.* and *A.A.R.P.  See J.G.G.*, 145 S. Ct. at 1006 (recognizing courts may resolve questions of

---

[27] As the Court has previously mentioned, the AEA had not been invoked in 1941.

the AEA's "interpretation and constitutionality"); *see generally A.A.R.P.*, 145 S. Ct. at 1370 (remanding to consider whether the AEA authorizes removal pursuant to Proclamation 10903). Judicial review of Petitioner's challenges preserves the separation of powers by ensuring that any president does not exceed the specific authority Congress delegated in the AEA. Judicial review in this case is just another function of the core principle of our democracy – the checks and balances each co-equal branch of our government has the duty to carry out. Any assertion by Respondents this is not the case is unsubstantiated by precedent and law.

C. Proclamation 10903 is unlawful because it does not comport with the AEA, does not comport with the Constitution, and seeks to render the INA's relief from removal void.

To be clear, the Court is assessing whether Proclamation 10903, as a stand-alone executive order, is lawful. In assessing the legality of Proclamation 10903, the Court will address three key ways in which Proclamation 10903 falls short on its face. The Court need not look beyond the four corners of Proclamation 10903 to see the obvious legal defects it entails.

1. Proclamation 10903 does not comport with the statutory bounds of the Alien Enemies Act.

Petitioner argues Proclamation 10903 is unlawful because its implementation is inconsistent with the AEA. Pet. 22, ECF No. 1. Under the AEA, a president cannot unilaterally define what constitutes an invasion, summarily declare that a foreign nation or government has threatened or perpetrated an invasion or predatory incursion of the United States, identify alien enemies subject to detention or removal, and summarily remove them. *See J.A.V.,* 2025 WL 1257450 at *1; *Cf. United States v. Abbott*, 110 F.4th 700, 736 (5th Cir. 2024) ("[t]o be sure, a state

of invasion under Article I, section 10 does not exist just because a State official has uttered a certain magic word.") (Ho, J., concurring).

This Court need not look beyond the four corners of Proclamation 10903 to find its severe deficiencies in comporting with the AEA. Even accepting every assertion in Proclamation 10903 as true, it does not rise to meet the plain, ordinary meanings of the statutory terms. Any proclamation by a sitting president attempting to invoke the AEA by executive order must include sufficient factual statements, including reference to other pronouncements, to enable a court to determine whether the conduct and events satisfy the conditions that support the invocation of the statute. For the foregoing reasons, the Court agrees Proclamation 10903 does not meet the statutory preconditions to lawfully invoke the AEA and its powers.

> a.  *Proclamation 10903 does not establish an "invasion" or "predatory incursion" within the meaning of the AEA.*

Petitioner alleges no "invasion" or "predatory incursion" has occurred, been threatened, or been attempted. Pet'r's Mem. of Law in Supp. of Mot. 16–20, ECF No. 34-1. In accordance with established principles of statutory construction, a court begins with a plain reading of the text of the statute. Courts normally interpret statutory terms "consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (internal citation omitted). When ascertaining the plain, ordinary meaning of founding era language, courts rely on contemporaneous dictionary definitions and historical records that reveal the common usage of the terms at issue. *See, e.g., D.C. v. Heller*, 554 U.S. 570, 581–83 (2008) (examining founding era writings and commentaries to determine the commonly understood meaning of "keep and bear arms"); *Utah v. Evans*, 536 U.S. 452, 492 (2002) (Thomas, J.,

25

concurring) ("Dictionary definitions contemporaneous with the ratification of the Constitution inform our understanding.").

In the present context, Judge Fernando Rodriguez, Jr.'s ("Judge Rodriguez") analysis in *J.A.V.* is informative[28]. In reaching his decision, Judge Rodriguez surveyed several sources from 1780 to 1820 using primarily Founders Online[29], a database of historical records that the National Archives maintains. *J.A.V.*, 2025 WL 1257450 at *16. This Court incorporates these sources in full by reference.[30] Judge Rodriguez found "the plain, ordinary meaning of "invasion" was an entry into the nation's territory by a military force or an organized, armed force, with the purpose of conquering or obtaining control over territory." *Id.* at 16. Further, "the common usage of 'predatory incursion' and, to a lesser degree, 'incursion,' referenced a military force or an organized, armed force entering a territory to destroy property, plunder, and harm individuals, with a subsequent retreat from that territory." *Id.* Judge Rodriguez further found "an 'invasion' . . . must involve an organized, armed force entering the United States to engage in conduct destructive of property and human life in a specific geographical area." *Id.* at 17.

This Court agrees the plain, ordinary meaning of "invasion" and "predatory incursion," as the terms were understood in 1798, require a militarized effort against, and militarized intrusion into, the territory of the United States with the specific purpose[31] of conquering or obtaining

---

[28] *See generally J.A.V.*, 2025 WL 1257450 at *12–19.

[29] Courts have used this database for similar analyses. *See, e.g., Carpenter v. United States*, 585 U.S. 296, 347 (2018) (Thomas, J., dissenting) (using the database to note that the phrase "expectation(s) of privacy" did not appear in "the papers of the prominent Founders").

[30] *See J.A.V.*, 2025 WL 1257450 at *16 (Appendix A) (identifying records and providing links).

[31] This Court's reading of the terms "invasion" and "predatory incursion" do not limit a president's power to invoke the AEA when there is a declared war.

control over territory.  This Court rejects Respondents' invitation to broaden the meaning of these terms.  Ascertaining the plain, ordinary meaning of a term has never required a court to expand its reach to encompass all possible definitions.

While Respondents argue "[c]onsidering 'invasion' or 'predatory incursion' to apply only to. . . a rudimentary understanding of warfare—a type of warfare becoming extinct—not only fails to comport with contemporaneous understanding and usage, but also renders the AEA irrelevant in modern times, contrary to Congress's intent," it is not in this Court's province to legislate to accommodate such modernization.  *See* Resp'ts' Opp'n to Mot. 17, ECF No. 39.  Policy considerations meant to enlarge the meaning of terms beyond how they were understood at the time of the founding have no place in this Court's analysis.  If Congress deems this modernization of warfare, as Respondents characterize it, renders the plain meaning of the AEA irrelevant, it can certainly legislate to amend the statute.  This Court, however, will not engage in that sort of policymaking.

Upon defining the statutory terms, the Court looks to the four corners of Proclamation 10903 to determine whether the assertions rise to meet the ordinary, plain meaning of "invasion" or "predatory incursion."  For purposes of this analysis, this Court will accept all assertions as true.[32]  Even then, it is clear they do not rise to the level of an "invasion" or "predatory incursion" as defined in the AEA.  Proclamation 10903 alleges TdA "has engaged in and continues to engage in mass illegal migration to the United States to further its objectives of harming United States

---

[32] This Court reserves ruling as to its authority to review the veracity of the factual assertions set forth in Proclamation 10903.

citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 14, 2025).

      Mass illegal migration or criminal activities plainly do not fall within the AEA's statutory boundaries. Proclamation 10903 does not assert TdA is acting as an army or a military force. Nor is the stated purpose for entry into the United States territory with an intent to gain a territorial foothold on the United States for military purposes. TdA's alleged actions are simply not "against the territory"[33] of the United States. This Court does not minimize the important interest the Executive Branch has in combating these activities. Yet, it is equally important that the Executive's methods for combating these activities comport with the laws enacted by Congress, including removal authority under the INA, and federal criminal laws. The AEA was clearly not meant to be all-encompassing. As such, this Court declines to stretch the AEA's meaning so broadly that mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," and virtually any group, hailing from virtually any country, could be deemed alien enemies.

---

[33] Respondents also introduced an FBI Intelligence Assessment that notes "[t]he FBI assesses, in the next 6 to 18 months, some Venezuelan Government officials likely will attempt to leverage TdA members in the United States as proxy actors to threaten, abduct, and kill members of the US-based Venezuelan diaspora who are vocal Maduro critics. Ex. C, FBI Intelligence Assessment 6, ECF No. 54.

      b.    *Proclamation 10903 does not establish TdA is a "foreign nation or government" within the meaning of the AEA.*

Similarly, Proclamation 10903 does not establish TdA is a "foreign nation or government" within the meaning of the AEA[34]. Pet'r's Mem. of Law in Supp. of Mot. 20, ECF No. 34-1. Respondents assert "[t]he government is not arguing that TdA is itself a 'nation.' But the control and authority TdA exercises in Venezuela is consistent with founding era definitions of 'government.'"[35] Resp'ts' Opp'n to Mot. 21, ECF No. 39.

Proclamation 10903 sets forth several assertions about TdA, including the following. First, "TdA operates in conjunction with Cártel de los Soles, the Nicolas Maduro regime-sponsored, narco-terrorism enterprise based in Venezuela." Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 14, 2025). Second, "TdA is closely aligned with, and indeed has infiltrated, the Maduro regime." *Id.* Third, "Maduro leads the regime-sponsored enterprise Cártel de los Soles, which coordinates with and relies on TdA." *Id.* Fourth, "Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA." *Id.* Fifth, "TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela." *Id.*

---

[34] Petitioner cites Johnson's Dictionary, Nation (1773) to define "foreign nation or government" as "[a] people distinguished from another people; generally by their language, original, or government." Petitioner also cites to Webster's Dictionary, Nation (1828) defining a "foreign nation or government" as "[a] body of people inhabiting the same country or united under the same sovereign government; as the English nation."

[35] Respondents cite Thomas Dyche & William Pardon, A New General English Dictionary (1754) which defines "government" as "the power or authority that one person exercises over another."

Notably, what Proclamation 10903 does not say is that TdA *is* the Venezuelan government. Nor does it specify TdA controls any specific territory in Venezuela. Proclamation 10903 itself undermines Respondents assertion in their Response in Opposition that TdA is the Venezuelan government. *See generally* Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 14, 2025) (asserting "the Maduro-regime has ceded over control to TdA", yet the "TdA acts at the direction of the Venezuelan government"). Put simply, if TdA was a 'foreign nation or government' as required by the AEA, there would be no need for it to 'undertake hostile actions . . . at the direction . . . of the Maduro regime." Therefore, Proclamation 10903 fails on its face to meet the definition of a "foreign nation or government" as required by the AEA.

> c.     *Proclamation 10903 does not allow for voluntary departure as required by the AEA's Section 21.*

As a final matter, Proclamation 10903 does not comport with the AEA because it categorically bars any opportunity for voluntary departure as required by the AEA's Section 21. The AEA refers to voluntary departure in two distinct sections: Section 21 and Section 22. Section 21 of the AEA states, in relevant part, "[t]he President is authorized in any such event . . . to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom." 50 U.S.C. § 21. On the other hand, Section 22 reads that an alien enemy

> shall be allowed, for the recovery, disposal, and removal of his goods and effects, and for his departure, the full time which is or shall be stipulated by any treaty then in force between the United States and the hostile nation or government of which he is a native citizen, denizen, or subject; and where no such treaty exists, or is in force, the President may ascertain and declare such *reasonable* time

as may be consistent with the public safety, and according to the
dictates of humanity and national hospitality.

*Id.* at § 22 (emphasis added).

In Proclamation 10903, President Trump "find[s] and declare[s] that all such members of
TdA are, by virtue of their membership in that organization, chargeable with actual hostility against
the United States and are therefore ineligible for the benefits of 50 U.S.C. 22… [and] further find[s]
and declare[s] that all such members of TdA are a danger to the public peace or safety of the United
States." Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 14, 2025). Sections 21 and 22,
Petitioner argues, "afford[] individuals designated as alien enemies an opportunity to voluntarily
depart from the United States" and that "the President may lawfully remove noncitizens under the
AEA *only when* those designated noncitizens "refuse or neglect to depart" voluntarily." Pet'r's
Mem. of Law in Supp. of Mot. 14–15, ECF No. 34-1 (emphasis added).

Respondents argue Petitioner's reading that a voluntary department period is *required* is
not defensible because while "the AEA permits the President to 'provide for the removal of those
who, not being permitted to reside within the United States, refuse or neglect to depart therefrom
. . . .[,]' the AEA "also broadly provides that alien enemies within the purview of a Proclamation
"shall be . . . removed as alien enemies." Resp'ts' Opp'n to Mot. 24, ECF No. 39. Respondents
further contend that "[i]n this context, where the alien enemies are members of the hostile force
itself, the President cannot be required to provide any period of voluntary departure prior to
effectuating removal" because that would frustrate the AEA's entire purpose if active participants
in hostilities must be asked to depart on their own terms. *Id.*

Respondents' argument is flawed. Based on a plain reading of Section 21, an opportunity to voluntary depart is a statutory condition precedent to removal. *See U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947). As Petitioner sets forth[36], courts interpreting the AEA during World War II consistently recognized that alien enemies retained a right to voluntary departure under Section 21 of the AEA. On its face, Section 22 of the AEA reads to establish separate rights concerning specific conditions for departure as they relate to bilateral treaties or "national hospitality", with an exception for those "chargeable with actual hostility, or some other crime against public safety." *See* 50 U.S.C. § 22. While the president retains control over the terms[37] of voluntary departure under Section 21, based on the plain language, he must allow for some opportunity to do so. Further, the statute calls for an individualized assessment as it relates to voluntary departure. Therefore, Proclamation 10903 does not comport with the AEA because it denies the statutory condition precedent of voluntary departure pror to involuntary removal under the AEA.

---

[36] *See* Pet'r's Mem. of Law in Supp. of Mot. 12, ECF No. 34-1 (citing *U.S. ex rel. Ludwig*, 164 F.2d at 457 (Section 21 establishes a "right of voluntary departure."); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (holding that the detainee's "present restraint by the respondent is unlawful in so far as it interferes with his voluntary departure, since the enforced removal, of which his present restraint is a concomitant, is unlawful before he does 'refuse or neglect' to depart."); *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will.")).

[37] Section 21 of the AEA gives the President the authority "to establish *any other regulations* which are found necessary in the premises and for the public safety," but does not allow him to summarily deny the opportunity to voluntary depart as plainly stated earlier in the statute.

2.   <u>Proclamation 10903 violates the Fifth Amendment's Due Process Clause.</u>

Petitioner argues Proclamation 10903 is patently unlawful insofar as it seeks to summarily remove noncitizens without adequate notice and a meaningful opportunity to challenge "alien enemy" designations without due process of law as expressly required by the Constitution. Pet'r's Mem. of Law in Supp. of Mot. 13–14, ECF No. 34-1.  Conversely, Respondents argue the AEA is a wartime authority designed to allow for the quick expulsion of alien enemies from the United States and doesn't impose specific notice or timing requirements. Resp'ts' Opp'n to Mot. 22, ECF No. 39.  Respondents further argue that "[e]ven if Petitioner is entitled to some due process, what is owed is "flexible and calls for such procedural protections as the particular situation demands." *Id.* at 22–23, ECF No. 39 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

a.   *Noncitizens are entitled to due process in any removal proceeding.*

It bears repeating that the Constitution is the supreme law of the land, and no law, whether promulgated by Congress or by Executive Order, may exceed constitutional bounds.  Let there be no doubt – every person, on United States soil, regardless of their legal status, is entitled to due process of law under the Constitution in deportation proceedings. *See Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings."). As such, "it is not competent for . . . any executive officer . . . arbitrarily to cause an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States." *Yamataya v. Fisher*, 189 U.S. 86, 101

(1903). "*No such arbitrary power can exist* where the principles involved in due process of law are recognized." *Id.* (emphasis added).

A president's authority under the AEA is no different and remains constrained by due process principles. In the present case, the Court is not presented with a question of *if* Petitioner and the certified class are entitled to due process. As hundreds of years of precedent have established, Petitioner and the certified class are *definitively* entitled to due process. *See J.G.G.*, 145 S. Ct. at 1006. The question for the Court is simply how much process is due.

> b.    *Respondents must provide at least thirty-days notice to noncitizens designated as alien enemies under the AEA.*

As the Supreme Court has already established, detainees under the AEA "are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" *J.G.G.*, 145 S. Ct. at 1006 (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "More specifically, in this context, AEA detainees must receive notice . . . that they are subject to removal under the Act." *Id.* This notice "must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* "In order to 'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *A.A.R.P.*, 145 S. Ct. at 1368. While the Supreme Court did not specify how much notice is due, it made clear "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *Id.*

This Court looks to prior invocations of the AEA to determine what notice is constitutionally compelled in this context. During World War II, President Truman invoked the

AEA after Congress declared war between the United States and Japan, Germany, Italy, Bulgaria, Hungary, and Rumania[38]. Pres. Proc. No. 2685, 60 Stat. 1342 (Apr. 10, 1946). At the height of this global conflict, President Truman declared that alien enemies ordered removed under the AEA were allowed a 30-day notice to "effect the recovery, disposal, and removal of his goods, and effects, and for his departure." *Id.* at § 2. It follows that when a president seeks to invoke the AEA in times when there is decidedly not a declared war, but rather something less in the form of a potential "invasion" or "predatory incursion," that those designated alien enemies must receive at the very least a 30-day notice prior to their removal. Any President invoking the AEA to address an "invasion" or a "predatory incursion" may, of course, allow more time, but surely not less than was given at the height of a declared war.

Respondents argue "a thirty-day notice is both excessive and unnecessary," but fail to set forth specific burdens sufficient to outweigh due process considerations. Resp'ts' Opp'n to Mot. 23, ECF No. 39. On balance, while this Court recognizes a president's concerns about national defense when invoking the AEA, "[i]t would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile." *United States v. Robel*, 389 U.S. 258, 264 (1967).

Therefore, the Court finds that when an "invasion" or "predatory incursion" is the basis for the invocation of the AEA, the government must provide alien enemy designees at least a 30-day notice prior to removal. This notice shall be written in a language the alien enemy designee understands and must provide information about how to exercise due process rights to contest that

---

[38] Rumania is now spelled as "Romania."

removal. *See generally A.A.R.P.*, 145 S. Ct. at 1368 ("notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster.").

As a final matter, Respondents objected to this Court's consolidation of the preliminary injunction hearing with the trial on the merits, alleging resolution on the merits is premature given the administration has not yet implemented a new notice policy after the Supreme Court's *A.A.R.P.* decision. Resp'ts' Notice of Obj. 1, ECF No. 49. To recount, Respondents first began using Proclamation 10903 without providing any notice at all. After the Supreme Court's decision in *J.G.G.*, Respondents changed their policy to provide notice written only in English just twelve hours ahead of scheduled removal, and allowing those who affirmatively state they intend to file a habeas petition only 24 hours to do so. *See* Pet'r's Mem. of Law in Supp. of Mot. 4–5, ECF No. 34-1 (citing Sarabia Roman Decl., Ex. H, Pet'r's Mem. of Law in Supp. of Mot., ECF No. 34-10 and Cisneros Decl., Ex. A, Pet.'s Mem. of Law in Supp. of TRO, ECF No. 3-2). Respondents' objection is overruled because the Court need not wait on yet another iteration of Respondents' attempts to land on a magic number for notice. Instead, this Court looks to due process principles and precedent to ascertain the amount of time necessary to pass constitutional muster.

   3.   <u>Proclamation 10903 is unlawful because it directly conflicts with the INA regarding removal procedures and bars humanitarian removal protections included in the INA.</u>

In the immigration context, all roads lead to the INA. The AEA cannot be read in isolation. The interplay between the AEA and the INA is most simply understood as a relationship between removal power versus removal procedure. To be clear, Plaintiff is not challenging the outcome of

an individual asylum, withholding of removal, or CAT claim that would generally limit judicial intervention; rather she is challenging Proclamation 10903 because it denies the opportunity to even assert such claims.  Because Proclamation 10903 categorically bars the INA's procedures from applying to removals and does not allow designees to apply for humanitarian protections, it is unlawful.  For the reasons stated herein, noncitizens designated for removal solely under the AEA may still be entitled to the full removal procedures in Title 8, but at a minimum they must be allowed to apply for humanitarian relief from removal.

> a. *The history of the AEA and the INA is indispensable to decipher how the two statutes function with each other.*

The AEA was enacted in 1798 and last invoked in 1941.  In 1952, the INA codified a comprehensive overhaul of immigration laws, and later included humanitarian relief from removal, including asylum, withholding of removal, and CAT. *See Lehmann v. U.S. ex. rel. Carson*, 353 U.S. 685, 687 (1957).  The 1798 AEA's wartime authority grants the President specific powers with respect to the regulation, detention, and removal of individuals designated as alien enemies. *See* 50 U.S.C. § 21.  As codified today, the AEA provides:

> [w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the president makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

*Id.*

Prior to Proclamation 10903, "U. S. Presidents have invoked the Alien Enemies Act only three times, each in the context of an ongoing war: the War of 1812, World War I, and World War II." *J.G.G.* 145 S. Ct. at 1008 (Sotomayor, J. dissenting).  While the AEA has been applied to different groups of people during different moments in history, the constant across all previous invocations is that the United States was actively engaged in armed conflict with the nation states from which the individuals originated. *See generally Lockington*, 15 F. Cas. at 758–759 (discussing the War of 1812 proclamation); Declaring the Existence of a State of War with the German Empire and Setting Forth Regulations Prescribing Conduct Toward Alien Enemies, Proclamation No. 1364, 40 Stat. 1650 (World War I); Alien Enemies–Japanese, Proclamation No. 2525, 55 Stat. 1700 (World War II).

In 1952, Congress enacted the INA and codified it in Title 8 of the United States Code beginning in Section 1101. *Lehmann*, 353 U.S. at 687.  This law "repealed the Immigration Act of February 5, 1917, and, in many respects, substantially changed" immigration law in the United States. *Id.*  The INA controls nearly all aspects of immigration law within the United States. Relevant to the case at hand, Section 1229a governs removal proceedings and states,

> [u]nless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.

8 U.S.C. § 1229a(a)(3).

The present case involves three types of later-enacted humanitarian relief from removal: asylum, withholding of removal, and CAT.  In the aftermath of the Vietnam War, the need for a change in American policy concerning refugees became apparent as hundreds of thousands of

Vietnamese and Cambodians fled political chaos and physical danger in their homelands[39].  In response, Congress passed, and President Jimmy Carter signed, the Refugee Act of 1980, which not only provided for the admission and adjustment of status of refugees but also established procedures for aliens to seek asylum. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980).  Asylum is now codified in Title 8 Section 1158, and states "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival[)] . . . irrespective of such alien's status, may apply for asylum in accordance with this section . . . ." 8 U.S.C. § 1158(a)(1).  Although the opportunity to apply for asylum is far-reaching, to be eligible for asylum, applicants must be able "to establish that the applicant is a refugee within the meaning of" Section 1101(a)(42)(A), meaning "the applicant must establish race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(1)(A) – (B)(i).

Codified in Section 1231(b)(3), withholding of removal is a separate form of relief which restricts the Attorney General from "remov[ing] an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1231(b)(3). Notably, this Section does not limit the availability of withholding of removal to individuals ordered removed under Title 8.

---

[39] *Refugee Act of 1980*, National Archives Foundation, https://archivesfoundation.org/documents/refugee-act-1980 [https://perma.cc/N3VN-98TK] (last accessed June 6, 2025).

Lastly, in 1988, the United States was a signatory to the Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 114 (1988). Article 3 of CAT expressly prohibits the United States from returning any person to a country in which it is more likely than not that he or she "would be in danger of being subjected to torture." *Id.* CAT is a treaty signed and ratified by the United States but is not self-executing. 136 Cong. Rec. 36,198 (1990). Congress, however, implemented the treaty by statute as part of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"). 8 U.S.C. § 1231 note (2000); *see also* C.F.R. §§ 208.16 to 208.18 (FARRA procedure). That statute declares it "the policy of the United States not to . . . extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *Id.* Although Article III courts are generally unable to review CAT determinations, immigration courts are generally compelled to make a CAT determination if a noncitizen raises torture claims.

> b.   *The President's power under the AEA does not summarily override the INA's removal procedures and the availability of humanitarian relief from removal.*

A key issue before the Court is the interplay between two statutes seemingly in conflict. There is no question the INA was passed after the AEA and has since been amended multiple times. The question for this Court is, therefore, whether the AEA categorically overrides the INA— a later-enacted law Congress passed with full knowledge of the AEA. Based on principles of statutory interpretation, the Court finds the AEA does conflict, at least in part, with the INA's "sole

and exclusive" removal procedure, as well as with the humanitarian protections the INA affords. Because Proclamation 10903 categorically bars any application of the INA to removals thereunder, Proclamation 10903 is unlawful.  To be clear, this Court is not ruling on whether the Alien Enemies Act, as enacted in 1798, is unlawful or unconstitutional, but only that Proclamation 10903 does not comport with the legal mandates of the INA.

> i. Respondents must follow the INA's "sole and exclusive" procedures of removal for AEA designees who have been admitted into the United States.

As a preliminary matter, Respondents assert "immigration laws and [the] AEA have been read harmoniously for over 75 years." Resp'ts' Opp'n to Mot. 25, ECF No. 39 (citing to *U.S. ex rel Von Kleczowski v. Watkins*, 71 F.Supp. 429, 437 (S.D.N.Y. 1947)).  Respondents' argument is misleading, if not intentionally so.  Until 2025, no president since the 1940s had invoked the AEA. As such, courts have not had the occasion to discuss the interplay between the INA, as enacted in 1952, and the 1798 AEA.

"[T]he general proposition that courts should not look past the words of a clear statute— often called the 'plain meaning rule'—is a common judicial proposition." *Barbee v. United States*, 392 F.2d 532, 535 n.4 (5th Cir. 1968) (citations omitted).  The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  "[W]hen the statute's language is plain," "at least where the disposition

required by the text is not absurd," the sole function of a court is to enforce it according to its terms. *Lamie v. U.S. Trustee,* 540 U.S. 526, 534 (2004) (internal citations omitted).

Here, the AEA allows a President to "provide for the removal" of alien enemies assuming all other statutory preconditions are met but does not give specific procedures for removal. The INA's Section 1229a broadly governs removal proceedings and states:

> [u]nless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.

8 U.S.C. § 1229a(a)(3).

Based on the plain meaning of the text in each statute, the interplay between the two statutes can be best understood as creating two categories: (1) noncitizens subject to the AEA who have been admitted to the United States, and (2) noncitizens subject to the AEA who have not been admitted to the United States.

Admissibility into the United States is a function of Title 8.[40]   Notably, a positive admissibility determination does not inherently grant a person any immigration benefit, including residency or citizenship. *See e.g.* 8 U.S.C. § 1255 (outlining the multiple requirements to become a lawful permanent resident). For our purposes, it is important to note Proclamation 10903 applies to Venezuelan nationals "within the United States, [who] are not actually naturalized or lawful permanent residents of the United States." Based on its text, a noncitizen deemed admissible may still be subject to Proclamation 10903.

---

[40]  *See* 8 U.S.C. § 1101(13)(A) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.")

Here, Petitioner falls into the first category encompassing noncitizens subject to the AEA who have been admitted into the United States. Petitioner is not a naturalized citizen or lawful permanent resident and is currently subject to removal under the AEA. Pet. 8, ECF No. 1. Petitioner has also been previously granted TPS. *Id.* Because a noncitizen must be deemed admissible to be eligible for TPS[41], Respondents would be compelled by Section 1229a to employ the INA's "sole and exclusive" procedures for determining whether Petitioner, as an alien admitted to the United States, may be removed, even if the reason for her removal is under the AEA. As such, even though the AEA can serve as a basis to designate someone removable from the United States, in order to give effect to the plain language of the INA, removal for noncitizens admitted to the United States must be carried out in accordance with the removal *procedures* established in the INA. In sum, Respondents must follow the INA's procedure for removal under Section 1229a for any noncitizen subject to removal under the AEA who has been admitted into the United States. In doing so, AEA designees who have been previously admitted into the United States will have the opportunity to apply to humanitarian relief from removal as generally permitted under Title 8.

Further, the Court agrees with Petitioner that if Congress wanted to include the AEA's removal power as a categorical exception to the INA's "sole and exclusive" removal procedure provision, it would have done so. Pet'r's Mem. of Law in Supp. of Mot. 27–28, ECF No. 34-1; Reply to Mot. 9, ECF No. 44 ("[W]hile Congress knew of the AEA when it enacted the INA, it

_____

[41] Form I-821, Instructions for Application for Temporary Protected Status, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, DEPARTMENT OF HOMELAND SECURITY, https://www.uscis.gov/sites/def ault/files/document/forms/i-821instr.pdf [https://perma.cc/LS6J-CJFM] ("To be eligible for TPS, you must be admissible to the United States as an immigrant under the applicable grounds in INA section 212(a)").

deliberately declined to exclude AEA-based removals from this statutory scheme—even as it carved out express exceptions elsewhere.") ("*[s]ee, e.g.,* 8 U.S.C. §§ 1225(b), 1531."); *see also Miles v. Apex Marine Corp.*, 498 U.S. 19. 32 (1990) (noting the Supreme Court "assume[s] Congress is aware of existing law when it passes legislation.") (citation omitted).

While this Court recognizes the INA and the AEA are two separate ways to subject an individual to removal, they can and must be read harmoniously.  Respondents contend that "[e]ven if there were a conflict between the AEA and the INA, the AEA would control here" because "it is a commonplace of statutory construction that the specific governs the general." Resp'ts' Opp'n to Mot. 25, ECF No. 39 (citing to *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1991)). Respondents argue "the AEA provides specific rules for removing a subset of aliens—those designated alien enemies—against the more general provisions relating to removability provided by the INA." *Id.* at 25–26.  The Court takes this cannon of specific governing the general to lend to a different conclusion.  The AEA generally provides for the removal of those designated alien enemies and does not proscribe any specific procedures that must be followed.  On the other hand, the INA provides it is the "sole and exclusive" procedure to determine specifically whether a noncitizen who has been admitted to the United States may be removed.  As such, the question of what procedures must be followed to remove a noncitizen is not answered by which statutory authority he or she is designated removable, but rather on whether any allegedly removable noncitizen was previously admitted into the United States.

> ii.   Noncitizens not previously admitted into the United States and subject to the AEA remain eligible to apply for humanitarian relief from removal.

There is yet to be a specific procedure applied to noncitizens who fall in the second category and are subject to the AEA but have not previously been admitted into the United States. As previously stated, Proclamation 10903 is unlawful because it categorically forecloses any opportunity to invoke congressionally afforded relief from removal under Title 8.  Respondents contend "individuals subject to removal under Title 50 are barred from asylum and withholding of removal." Resp'ts' Opp'n to Mot. 27, ECF No. 39.  In other words, Respondents assert that if an individual is subject to removal under the AEA, then they have no rights under the INA. Respondents further argue that because "[t]he United States continues to abide by its policy not to remove aliens to countries in which they are likely to be tortured," there is therefore "no direct conflict between the United States' obligations under the CAT as codified by the FARRA and removals under the AEA." *Id.* at 26.

Because of the clear language of the asylum, withholding of removal, and CAT laws, AEA designees in the second category retain the right to *apply* for such relief in immigration courts.  To be clear, this Court is not asserting that Article III courts may decide the merits of any such claims. The extent of the Court's decision today is that based on due process and the plain language of each statute.  A congressionally afforded opportunity to apply for humanitarian relief from removal cannot be stripped away by the AEA's removal power.

Take asylum, for example.  Section 1158 unequivocally states "[a]ny alien who is physically present in the United States or who arrives in the United States [,]whether or not at a designated port of arrival . . . irrespective of such alien's status, may apply for asylum in accordance

with this section." 8. U.S.C. § 1158(a)(1).  We need only to read the statute to see how broad the opportunity to apply for asylum is.  The opportunity to apply is contingent on one thing: presence on U.S. soil, regardless of how one entered.  There is no exception written by Congress from this opportunity to apply for asylum for people subject to the AEA, and this Court declines to read an exception into it.  As such, the AEA's removal powers do not strip away an individual's right to apply for asylum.

The same is true for withholding of removal.  The opportunity to apply for withholding of removal is not cabined by the underlying reason or authority for removal.  Section 1231(b)(3)(A) states "[n]ot withstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(a).  Yet again, there is no language in the statute that limits when an individual ordered removed may apply for this relief.

Lastly, AEA designees must be given an opportunity to apply for CAT relief to comply with international law.  Respondents' assertion that CAT relief is not being infringed on because the United States avoids removals to countries[42] where noncitizens will likely be tortured is not enough.  The Court agrees with Petitioners that protections under CAT "categorically prohibit[]

---

[42] This assertion is heavily contradicted by evidence in the record detailing the alleged human rights violations perpetrated in El Salvador's Center for Terrorism Confinement ("CECOT") prison, where nearly 200 people have been deported. *See* Pet'r's Mem. of Law in Supp. of Mot. 29, ECF No. 34-1 ("Prison officials there engage in widespread physical abuse, including waterboarding, electric shocks, using implements of torture on detainees' fingers, forcing detainees into ice water for hours, and hitting or kicking detainees so severely that it causes broken bones or ruptured organs. Ex. D (Bishop. Decl.) ¶¶ 21, 33, 37, 39, 41; Ex. E (Goebertus Decl.) ¶¶ 8, 10, 17.").

returning a noncitizen to any country where they would more likely than not face torture." Pet'r's Mem. of Law in Supp. of Mot. 25, ECF No. 34-1 (citing 8 U.S.C.§ 1231 note).  It would be impossible for Respondents *to know* whether an individual may be more likely than not to face torture without the opportunity to address an immigration judge and present evidence.  CAT protections apply regardless of the authority for removal.  As such, AEA designees must be given the opportunity to apply for CAT relief in accordance with the applicable laws and regulations.

Nothing in this Court's analysis should be construed as a directive to the Executive in determining the merits of an individual asylum, withholding of removal, or CAT claim. *Entitlement* to such relief is at the discretion of the Executive, but the opportunity to apply for such relief afforded by Congress is not.  Therefore, each individual AEA designee must still be afforded the opportunity to raise its claims for relief from removal and have such claims adjudicated pursuant to the procedures set forth by Congress.

      iii.    This Court's framework adequately accounts for due process under Title 8, the power of the Executive under the AEA, and Supreme Court precedent.

As a final matter, the Court notes this framework allows the President to use his executive power in designating individuals "alien enemies" under the AEA, gives full effect to congressionally enacted avenues for humanitarian relief from removal under the INA, and does not disrupt the process set forth by the Supreme Court for challenging an "alien enemy" designation in Article III courts through a petition for a writ of habeas corpus.  As this Court has previously cautioned, this opinion does not venture to invalidate the entirety of the AEA, but rather solely invalidates Proclamation 10903 as it was issued.

For clarity, this Court sums up its findings regarding the interplay between the INA, the AEA, and the Supreme Court's mandates.  Under the AEA, a president retains the authority to designate individuals as "alien enemies" and establish a basis for removability pursuant to the criteria set forth within a properly enacted proclamation invoking the AEA.  Once designated, an individual will be entitled to a thirty-day notice and opportunity to file a habeas petition to challenge the lawfulness of their detention and their designation as alien enemies.

If an AEA designee has been previously admitted into the United States, Respondents *must* follow removal procedures pursuant to the plain language of Section 1229a of the INA to determine whether such individual may be removed.  While in removal proceedings under Title 8, these AEA designees will have access to apply to all relief protections afforded under Title 8 and applicable regulations.

If an AEA designee has *not* been previously admitted, Respondents retain the discretion as to the precise procedures to follow, but must, as a matter of law, afford a designee the opportunity to apply for asylum, withholding of removal, or CAT relief, and have their claims adjudicated in accordance with existing law.  In sum, this framework in no way prohibits Respondents from removing individuals under independent provisions of Title 8.

    4.   <u>The INA does not restrict this Court from enjoining AEA designees' transfer out of the Western District of Texas.</u>

In her Petition, Petitioner prays this Court to "[e]njoin Respondents from transferring Petitioner and the class out of this district during the pendency of this litigation without advance notice to counsel." Pet. 27, ECF No. 1.  Respondents allege that "the INA bars this Court from entering injunctive relief with respect to transfers in three different ways." Resp'ts' Opp'n to Mot.

12, ECF No. 39.  First, the Executive has "great discretion in deciding where to detain petitioners" and that decision cannot be reviewed per Title 8 Sections 1231(g)(1) and 1252(a)(2)(B)(ii). *Id.* Next, they assert that Title 8 Section 1252(g) "prohibits district courts from hearing challenges to decisions and actions about whether, when, and where to commence removal proceedings." *Id.* at 13.  Finally, Respondents argue this Court cannot prevent Respondents from transferring any class member, "not named in this action on an individual basis, to a place of its discretion under 8 U.S.C. § 1231(g)." *Id.*

Respondents are incorrect in their reading of the INA.  The sections Respondents cite to do not support their claims that this Court lacks jurisdiction to prevent transfer of Petitioner and her class members. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); *see also Kucana v. Holder*, 558 U.S. 233, 247 (2010) (applying only to decisions where Congress has "set out the Attorney General's discretionary authority in the statute.").  Further, because a plain reading of Section 1231(g) does not address transfers, its inclusion in Respondents' reasoning is, likewise, inconsequential.

Finally, the Court agrees with Petitioner that the All Writs Act permits a court to "enjoin almost any conduct 'which left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion.'"  Reply to Mot. 10, ECF No. 44 (citing to *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004) (citation omitted)).  As such, the Court has the jurisdiction to enjoin Respondents from transferring Petitioner and certified class members out of the Western District of Texas during the pendency of their habeas proceedings.

5.  <u>The equitable factors weigh in favor of an injunction.</u>

This Court is tasked with determining whether the equitable factors and public interest-related factors present in this case weigh in favor of an injunction.  To succeed, Petitioner must establish that she is 1) likely to succeed on the merits, 2) likely to suffer irreparable harm absent an injunction, 3) that the balance of equities tips in her favor, and 4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Because this Court consolidated the hearing with the trial on the merits[43] and addressed all claims as a matter of law under the summary judgment standard, the first element is met.  As such, the Court will only address the final three factors.

Petitioner argues that "the balance of hardships overwhelmingly favors Petitioner." Pet'r's Mem. of Law in Supp. of Mot. 30, ECF No. 34-1 (citing to *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  She claims that the public has an interest not only in preventing the wrongful removal of individuals to places where they will face persecution and torture, *id.*, but also believes there is "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citing to *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  She alleges that Respondents cannot make a similar argument as to what harms they would suffer if an injunction were granted because there is no contesting "Respondents' ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under the immigration laws." *Id.* at 30–31 (internal citations omitted).

---

[43] *See* Order Consol., ECF No. 37.

Respondents, on the other hand, claim the equitable factors "weigh strongly in the government's favor." Resp'ts' Opp'n to Mot. 27, ECF No. 39.   Respondents argue "Petitioner failed to show that she will suffer irreparable harm" and the public interest favors denial of preliminary injunctive relief. *Id.* at 28.   In support of their claims, Respondents parrot their previous arguments that Petitioner has received due process, and that she has not "made a showing of likely irreparable harm from 'harsh and life threatening' conditions if removed" to El Salvador. *Id.* (internal citation omitted).   Respondents continue to tout their policy "not to remove aliens to countries where they are likely to be tortured." *Id.*   Finally, Respondents argue that "[a]n injunction effectively usurps the President's statutory and constitutional authority to address a terrorist gang that is engaging in an invasion," *id.* at 28–29, and claim that because an injunction would "imped[e] the Executive's ability to swiftly remove aliens with no right to remain in the United States who are identified as alien enemies due to their gang activity" this would ultimately harm the public. *Id.* at 29.

The stakes in this case, and others like it, could not be higher.   Respondents have removed hundreds of individuals, some based on allegedly "flimsy to nonexistent evidence" such as "tattoos and social media postings," *see* Mot., Ex. 8, ECF No. 34-10, to El Salvador's Center for Terrorism Confinement ("CECOT").   CECOT has "a troubling history of violating human rights and where men sleep hundreds to a cell on steel beds with no mattresses or pillows." Mot., Ex. 7, ECF No. 34-10.   In a 2023 report, even the Department of State emphasized CECOT's "[p]rison conditions . . . were harsh and life threatening," and testimonies from released prisoners show "systemic abuse

in the prison system, including beatings by guards and the use of electric shocks[44]." Decl. of Dr. Sarah C. Bishop, Mot. Ex. D, ECF No. 34-6.

It is unclear at best, and unlikely at worst, whether individuals removed to El Salvador under Proclamation 10903 will ever be released from prison. Further, Respondents take the position that, even when they make a mistake, they cannot retrieve individuals from the Salvadoran prisons to which it has sent them. *See* Defendant's Memo. of Law in Opp'n in *Abrego Garcia* v. *Noem*, No. 25–CV–951 (D. Md., Mar. 31, 2025), ECF Doc. 11, at 7–9; *see also J.G.G.*, 145 S. Ct. at 1010—11 (Sotomayor, J., dissenting) ("[t]he implication of the Government's position is that not only noncitizens but also United States citizens could be taken off the streets, forced onto planes, and confined to foreign prisons with no opportunity for redress if judicial review is denied unlawfully before removal. History is no stranger to such lawless regimes, but this Nation's system of laws is designed to prevent, not enable, their rise.").

Fortunately, this Court does not have to make this decision in a vacuum. The Supreme Court has also agreed that individuals in Petitioner's position have a high risk of severe irreparable harm. *See generally A.A.R.P.*, 145 S. Ct. at 1367 ("the District Court's inaction—not for 42 minutes but for 14 hours and 28 minutes—had the practical effect of refusing an injunction to detainees facing an imminent threat of severe, irreparable harm."); *see also J.G.G.*, 145 S. Ct. at 1010-11 (Sotomayor, J., dissenting) ("Deportation directly into CECOT presented a risk of extraordinary harm to these Plaintiffs."). In the same vein, the balance of the equities tip in Petitioner's favor

---

[44] Other forms of abuse highlighted by the State Department include "suffocation, burning, and mock executions against children" as well as "beatings and water boarding." *Id.*

and an injunction is in the public interest.  Based on the evidence put forth by Petitioners, the Court finds Petitioner has met her burden, and the equitable factors weigh in favor of granting an injunction.

## <u>CONCLUSION</u>

It is an established principle in our nation that no one is above the law. Prominent rhetoric surrounding immigration calls for noncitizens to follow the law in their attempts to enter the United States.  The same principle applies to our government.  The government, too, must follow the law when effectuating removals from the United States.  As explained by this Court, Proclamation 10903 falls short.

For the reasons stated above, this Court determines declaratory judgment, injunctive relief, and a writ of habeas corpus is proper.  Petitioner has standing to bring these claims, and all of Petitioners claims are justiciable.  Proclamation 10903 is unlawful because it fails to satisfy the statutory preconditions required to allow any president to invoke the Alien Enemies Act, 50 U.S.C. § 21.  Proclamation 10903 is further unlawful because it fails to comport with the Fifth Amendment's Due Process Clause and because it bars any application of the Immigration and Nationality Act, Title 8 of the United States Code, with respect to noncitizens admitted to the United States and to humanitarian relief from removal as established by Congress.

Lastly, because this Court finds there are no genuine issues of material fact and treats Petitioner's motion for a preliminary injunction as a motion for summary judgment, the Court issues permanent injunctive relief.

Accordingly, **IT IS HEREBY ORDERED** Petitioner M.A.P.S.', on her own behalf and as representative of the certified class, *"Class Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief,"* ECF No. 1, is **GRANTED**.

**IT IS FURTHER ORDERED** Petitioner M.A.P.S.', on her own behalf and as representative of the certified class, "Motion for Preliminary Injunction," ECF No. 34, is construed as a motion for a summary judgment and is **GRANTED**.

**IT IS FURTHER ORDERED** President Donald J. Trump's "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua," Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 14, 2025), is hereby **DECLARED UNLAWFUL.**

**IT IS FURTHER ORDERED** this Order **DOES NOT ENJOIN** Donald J. Trump, in his official capacity as the President of the United States[45].

**IT IS FURTHER ORDERED** Respondents Angel Garite, Mary De-Anda-Ybarra, Pamela Bondi, Kristi Noem, U.S. Dept. of Homeland Security, Todd Lyons, U.S. Immigration and Customs Enforcement, Marco Rubio, U.S. Dept. of State, Pete Hegseth, U.S. Dept. of Defense, Miguel Vergara, Bret Bradford, Bobby Thompson, Charlotte Collins, Rose Thompson, and Murray Agnew are **ENJOINED** from removing Petitioner or any member of the certified class, from the United States pursuant to Proclamation 10903.

**IT IS FURTHER ORDERED** Respondents Angel Garite, Mary De-Anda-Ybarra, Donald J. Trump, Pamela Bondi, Kristi Noem, U.S. Dept. of Homeland Security, Todd Lyons, U.S. Immigration and Customs Enforcement, Marco Rubio, U.S. Dept. of State, Pete Hegseth, U.S.

---

[45] "Petitioner does not seek to enjoin the President." Mot 18, ECF No. 34-1.

54

Dept. of Defense, Miguel Vergara, Bret Bradford, Bobby Thompson, Charlotte Collins, Rose Thompson, and Murray Agnew are required to provide any designees under the Alien Enemies Act at least **THIRTY (30) DAYS NOTICE** of such designation, and a meaningful opportunity to respond to such designation prior to removal from the United States.  Such notice must include the individual's constitutional right to seek judicial review, inform individuals they may consult an attorney, at their own expense, regarding their detention and Respondents' intent to remove them, and must be given and written in a language the individual understands.

 **IT IS FURTHER ORDERED** this Court **HAS AUTHORITY** to enjoin Respondents Angel Garite, Mary De-Anda-Ybarra, Pamela Bondi, Kristi Noem, U.S. Dept. of Homeland Security, Todd Lyons, U.S. Immigration and Customs Enforcement, Marco Rubio, U.S. Dept. of State, Pete Hegseth, U.S. Dept. of Defense, Miguel Vergara, Bret Bradford, Bobby Thompson, Charlotte Collins, Rose Thompson, and Murray Agnew **FROM TRANSFERRING** Petitioner M.A.P.S. or any member of the certified class out of the Western District of Texas during the pendency of their habeas petition without advance notice to their counsel of record and **HEREBY ENJOINS** Respondents from doing so.

 **IT IS FURTHER ORDERED** Petitioner M.A.P.S.', on her own behalf and as representative of the certified class, **SHALL NOT** be required to furnish security for costs.

 **IT IS FINALLY ORDERED** the instant Order **SHALL NOT** be construed as altering Respondents Angel Garite, Mary De-Anda-Ybarra, Donald J. Trump, Pamela Bondi, Kristi Noem, U.S. Dept. of Homeland Security, Todd Lyons, U.S. Immigration and Customs Enforcement, Marco Rubio, U.S. Dept. of State, Pete Hegseth, U.S. Dept. of Defense, Miguel Vergara, Bret

Bradford, Bobby Thompson, Charlotte Collins, Rose Thompson, and Murray Agnew's authority to detain and remove individuals from the United States under Title 8 of the United States Code, or any other immigration authority authorized by Congress.

SIGNED this ___9___ day of **June 2025**.

_____

**HONORABLE DAVID BRIONES**
**SENIOR UNITED STATES DISTRICT JUDGE**

56